Guy DURANT, et al., Petitioners,

v.

DISTRICT OF COLUMBIA ZONING
COMMISSION, Respondent,

and

901 Monroe Street, LLC, Intervenor.

No. 12–AA–973.

District of Columbia Court of Appeals.

Argued April 11, 2013.
Decided May 16, 2013.

David W. Brown, with whom Nicole W. Sitaraman, Washington, DC, was on the brief, for petitioners.

Irvin B. Nathan, Attorney General for the District of Columbia, and Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and James C. McKay, Jr., Senior Assistant Attorney General, filed a statement in lieu of brief in support of intervenor.

Paul A. Tummonds, Jr., Washington, DC, with whom Leonard H. Freiman, and Jonathan E. Small, Boston, were on the brief, for intervenor.

Before FISHER and EASTERLY, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

This case arises from a zoning dispute which has sharply divided the residents of a neighborhood in northeast Washington, D.C., near Catholic University. On June 8, 2012, the District of Columbia Zoning Commission issued an order approving the application of 901 Monroe Street LLC (the developer) for a Planned Unit Development (PUD) and a related zoning change. Petitioners, a group of area residents, who are known as the "200–Footers" because they live within 200 feet of the proposed development, have asked this court to review the order, contending that the Commission's approval of the developer's application was inconsistent and, indeed, irreconcilable with the District's Comprehensive Plan.[1] Nei-

---

1. The Comprehensive Plan, first adopted in 1986 and amended in 2006, establishes a "broad framework intended to guide the future land use planning decisions for the District." *Wis.–Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 394 (D.C.2011) (quoting *Tenley & Cleveland Park Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment*, 550 A.2d 331, 337 (D.C.1988)) (internal quotation marks omitted). The Plan, among other things, "[d]efine[s] the requirements and aspi-

ther the Commission nor the District's Office of Attorney General has participated in the proceedings before this court, and the Commission's decision is defended by counsel for the developer.

The Commission conducted extensive proceedings before reaching its decision, and it issued detailed findings of fact and conclusions of law. Contrary to the petitioners' claim that the Commission failed to act impartially, and although the Commission adopted substantially verbatim a number of the developer's more disputed proposed findings, we are satisfied that the Commission addressed this case with an open mind and considerable care and deliberation, and we are of the opinion that, for the most part, the Commission's findings are supported by substantial evidence on the record as a whole and that its legal analysis is generally sound. We therefore reject as meritless the petitioners' contention that no further proceedings are necessary and that this court should simply reverse the Commission's order and direct that the developer's application be denied. We agree with the petitioners, however, that the Commission failed to make findings on several disputed issues which are identified in Part III of this opinion, and we conclude that these issues are sufficiently significant to require a remand for additional findings of fact and conclusions of law.

## I.

The property at issue is an approximately 60,000–square–foot parcel located on the 900 block of Monroe Street, just south of the Brookland/CUA Metro station. It is bounded by Lawrence Street, N.E., to the south and 9th street, N.E., to the west. Currently, the parcel is home to at least five free-standing residences. The Colonel Brooks' Tavern is also located in the affected areas.

Prior to this application, the property was primarily authorized for residential use. The zoning regulations designated a portion of the property R–2 residential, and another portion C–1 commercial.[2] The Future Land Use Map (FLUM)[3] approved one part of the property for mixed-use moderate-density uses, another part for moderate-density residential uses, and a third part for low-density residential uses. The Generalized Policy Map (GPM)[4] also contemplated low-density residential use in the area, treating the property as a Neighborhood Conservation Area.[5]

On November 16, 2010, the developer submitted its PUD application to the Zoning Commission. Simultaneously, the de-

rations of District residents" and "[g]uide[s] executive and legislative decisions on matters affecting the District and its citizens." D.C.Code § 1–306.01(b)(1), (2) (2012 Supp.).

2. Under the District of Columbia Municipal Regulations, R–2 residential zoning consists primarily of "one-family, semi-detached dwellings," while C–1 zoning consists of "neighborhood shopping." 11 DCMR § 105.1(a)(2), (d)(1) (2011).

3. The FLUM is an aspect of the District's Comprehensive Plan, and carries the same weight as the Plan's written elements. 10–A DCMR § 225.1 (1994).

4. Unlike the FLUM, the GPM is not part of the Comprehensive Plan itself. Rather, it is a tool the Commission uses to "guide land use decision-making in conjunction with the Comprehensive Plan text, the Future Land Use Map, and other Comprehensive Plan maps." 10–A DCMR § 223.2 (1994).

5. Such areas, according to the GPM, "are primarily residential in character," with "[l]imited development and redevelopment opportunities" that are "small in scale." 10–A DCMR § 223.4, .5.

veloper also asked that the entire parcel be rezoned to C–2–B.[6] In its application, the developer proposed to transform the entire parcel, with the exception of five free-standing homes along 10th Street, into a mixed-use commercial and residential project. The project would include ground-floor commercial space for five to eight tenants, with more than 200 apartment units on the upper floors. The structure itself would reach six stories in height,[7] topping out at sixty feet, eight inches at its highest point, and carry a floor-to-area ratio (FAR)[8] of 3.31.

On March 14, 2011, the Commission held an initial hearing to consider the developer's proposal. At that hearing, the Commission heard testimony in support of the project from the Office of Planning (OP). It also considered OP's initial written report, in which OP concluded that the developer's proposal was not inconsistent with the Comprehensive Plan. In its report, OP indicated that in its view, the developer's proposal struck an appropriate balance between competing Plan policies, some of which encouraged new development around Metro stations, while others favored the preservation of existing neighborhoods.

In spite of OP's endorsement, some members of the Commission harbored lingering concerns. Specifically, they expressed reservations as to whether the project was consistent with the FLUM, whether it was congruent with the Brookland/CUA SAP,[9] and what its impact would be on the surrounding community. Commission Vice Chairman Konrad Schlater was especially concerned with OP's failure to include copies of the FLUM or GPM in its report, telling OP's representatives that "[w]e need to see [the GPM and FLUM]. Otherwise, we're flying blind, so to speak." Accordingly, the Commission chose not to schedule a formal public hearing, but instead asked OP to supplement its report with additional analysis regarding the SAP, FLUM, and GPM.

The Commission held a second hearing on July 25, 2011, to consider OP's revised report. That report contained a blown-up version of the FLUM, and indicated that "just over half" of the property was approved for moderate-density mixed uses. It also contained a reproduction of the GPM. As to the SAP, OP noted that "[t]here are elements ... that support development of the site as an important link between the new commercial uses that will be developed at [a recently-approved PUD project on Catholic University's campus] and the existing commercial uses on 12th Street." It also pointed to the existence of other, competing policies, which stressed conserving the local neighborhood's residential character. Ultimately, OP reiter-

6. C–2–B zoning allows for "community business centers" of "medium-high density." 11 DCMR § 105.1(d)(2)(B).

7. The FLUM approves portions of the property for moderate-density mixed uses, which "generally do not exceed five stories in height." 10–A DCMR § 225.9. Moreover, the Brookland/CUA Small Area Plan (SAP) provides that development along Monroe Street east of the WMATA tracks—where the property is located—may be allowed "up to a maximum of [fifty] feet [in height] through a Planned Unit Development." To better accommodate these designations, the developer proposed to set back the sixth floor from the building's edge, beginning at the fifty-foot mark.

8. FAR is "a figure that expresses the total gross floor area as a multiple of the area of the lot. This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot." 11 DCMR § 199.1 (2012).

9. SAPs are part of the Comprehensive Plan itself, but apply only to particular geographic areas. 10–A DCMR § 2503.1 (1994).

ated its conclusion that the developer's proposal struck an appropriate balance between these competing policies. After considering this new report, the developer's own supplemental submissions, and OP's testimony, the Commission scheduled the proposal for a public hearing.

Before the public hearing, OP submitted a third report, again concluding that the project was not inconsistent with the Comprehensive Plan as a whole. It reiterated its position that the FLUM designated "much of the site [as] suitable for mixed residential and commercial use." OP acknowledged that the developer's proposal would extend mixed commercial-residential uses into what was then a low-density residential area, but concluded that the proposal was nevertheless consistent with the FLUM "for the majority of the applicant's site."

The Commission held two days of public hearings on January 19 and February 2, 2012. During these hearings, the Commission heard testimony for and against the developer's proposal. Members of the local Advisory Neighborhood Committee, the District Department of Transportation, and OP testified in favor of the project. In opposition, the 200–Footers urged the Commission to reject the proposal. They raised a variety of concerns, claiming that the proposal amounted to a *de facto* extension of Catholic University's campus, that the developer could have adjusted its proposal to fit a less-intensive zoning designation, and that the developer's efforts to engage the community were inadequate.

Most significantly, the 200–Footers asserted that the proposal was inconsistent with the Comprehensive Plan. Specifically, they claimed that the proposed project was

contrary to the Plan's Land Use, Upper Northeast Area, and Urban Design Elements. They also argued that the proposal was inconsistent with the FLUM, and they alleged that OP misrepresented the FLUM in its reports. The petitioners submitted their own FLUM reproduction, and on the basis of that reproduction, they asserted that more than half of the property was actually reserved for low-density residential uses.[10] At the close of the hearing, the Commission again requested more information from OP, asking that Office to explain in greater detail why the proposal was not inconsistent with the Comprehensive Plan as a whole.

On February 23, 2012, OP submitted another supplemental report, in which it addressed the question whether the proposal was consistent with the GPM, FLUM, and Brookland/CUA SAP. First, OP explained that the GPM must be interpreted in conjunction with the Plan's written elements, including the Land Use Element. Second, OP noted that the FLUM merely established general development patterns, not parcel-specific zoning guidelines. Third, OP recognized that the SAP contemplated that new developments would not exceed five stories in height. Nevertheless, because the PUD regulations explicitly empowered the Commission to approve more intense development than would be allowed under as-of-right zoning, OP believed that the proposal was not necessarily inconsistent with the SAP.

Ultimately, the Commission unanimously approved the developer's application. In a forty-four page order, issued on June 8, 2012, the Commission concluded that the proposal would not, as a whole, be incon-

---

10. Specifically, they claimed that the FLUM approved only 37.5% of the property for mixed-use development, reserving the remainder for low-density residential use. In con- trast, OP stated in its report that "[a] majority of the applicant's site is shown as appropriate for moderate[-]density mixed uses."

sistent with the Plan.[11] In particular, the Commission focused on the Plan's Upper Northeast and Land Use Elements. The Commission noted that the Upper Northeast Element encouraged moderate-density mixed-use development, and that current zoning was inconsistent with that goal. The requested rezoning, the Commission found, would bring the property in line. As to the Land Use Element, the Commission pointed out that at least one land-use policy endorsed the use of Metro stations as development anchors. The developer's proposal would advance this policy, in the Commission's view, because it was the area's "most realistic development opportunity."

The Commission also found that the proposal "fully achieve[d] the goals outlined" in the Brookland/CUA SAP. Specifically, it concluded that the proposal would promote "[m]ixed-use development with community-serving retail" along Monroe Street. And while the Commission recognized that the project would exceed the SAP's fifty-foot height limit, it concluded that the project's proposed setbacks would render it "roughly equivalent" to a typical fifty-foot structure.

In regard to the FLUM, the Commission found that the map approved "over one-half" of the property for moderate-density mixed uses. It recognized that the proposal would extend commercial development into an area the FLUM reserved for low-density residential use, but reasoned that the FLUM was "not a zoning map and does not specify allowable uses or dimensional standards." Thus, viewing the proposal in the context of the Comprehensive Plan "as a whole," the Commission found it to be consistent with the FLUM.

## II.

Before this court, the petitioners raise two chief arguments. First, they claim that on its face, the developer's proposal was irreconcilable with the Comprehensive Plan, and that the Commission therefore had no authority to approve the developer's application. They ask that we reverse the Commission's decision outright and order that the application be denied. Second, they argue that even if the developer's proposal was consistent with the Plan—and they insist that it was not—the Commission failed to make adequate findings as to several material contested issues. We address these contentions in turn.

### A.

 In the District of Columbia, the Zoning Commission has the exclusive authority to enact zoning regulations, and it has the principal responsibility for assuring that those regulations are not inconsistent with the Comprehensive Plan. D.C.Code §§ 6–621.01(e), –641.01 (2008); *Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n*, 979 A.2d 1160, 1167 (D.C.2009); *Tenley & Cleveland Park Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment*, 550 A.2d 331, 341 (D.C.1988). Because of the Commis-

---

11. The Commission also rejected the petitioners' claim that the developer failed to reach out to the community or to take account of local concerns. The developer held at least four community-outreach meetings before submitting its application, and at least two additional meetings after the public hearings. The Commission credited testimony to the effect that the developer incorporated the community input it gathered during these meetings into its final proposal. In particular, the Commission found that the developer "engaged the [petitioners] to create community amenities and an enhanced construction management agreement that serves the interests of both the [petitioners] and the [developer]."

sion's statutory role and subject-matter expertise, we generally defer to the Commission's interpretation of the zoning regulations and their relationship to the Plan. *See Watergate E. Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning Comm'n,* 953 A.2d 1036, 1042 (D.C.2008) (quoting *Cathedral Park Condo. Comm. v. District of Columbia Zoning Comm'n,* 743 A.2d 1231, 1239 (D.C.2000)); *1330 Conn. Ave., Inc. v. District of Columbia Zoning Comm'n,* 669 A.2d 708, 714 (D.C.1995) ("This court defers to the interpretation by the agency of its own regulations 'unless plainly erroneous or inconsistent with the regulations.'" (quoting *Smith v. District of Columbia Bd. of Zoning Adjustment,* 342 A.2d 356, 360 (D.C.1975))).

 As a result, in cases such as the present one, our review of the Commission's decision is deferential. *See Wis.–Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n,* 33 A.3d 382, 388 (D.C.2011). It is not this court's role to "determine whether a particular zoning action is, or is not, desirable." *Watergate, supra,* 953 A.2d at 1042; *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 355 A.2d 550, 560 (D.C. 1976). Rather, we must affirm the Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings. *Watergate,* 953 A.2d at 1042 (quoting *Cathedral Park, supra,* 743 A.2d at 1239); *see also Wis.–Newark, supra,* 33 A.3d at 388; *Hotel Tabard Inn v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 747 A.2d 1168, 1173 (D.C.2000). In other words, so long as the Commission makes adequate findings, we will not "substitute [our] judgment for that of the [agency]."

*Watergate, supra,* 953 A.2d at 1043 (quoting *Brown v. District of Columbia Bd. of Zoning Adjustment,* 486 A.2d 37, 52 (D.C. 1984) (en banc)) (internal quotation marks omitted).

In addition to its authority to enact and amend zoning regulations, the Commission presides over the PUD process. Through this process, the Commission may provide an applicant with some flexibility, e.g., by permitting increased building height and density, in order to allow communities to be developed as a coherent whole, *Wis.–Newark, supra,* 33 A.3d at 391 (quoting *Watergate, supra,* 953 A.2d at 1040), provided "that the project offers a commendable number or quality of public benefits and that it protects and advances the public health, safety, welfare, and convenience." 11 DCMR § 2400.2 (2001). Key to this process is the Commission's authority to consider zoning amendments which may be necessary to accommodate a particular PUD proposal. *See* 11 DCMR § 2406.2 (2000). The Commission may not, however, use this process to approve a project or rezone an area in a manner inconsistent with the Comprehensive Plan, or with any "other adopted public policies and active programs related to the subject site." 11 DCMR § 2403.4 (2006); *see also* D.C.Code § 6–641.02 (2008).

### B.

 We reject the petitioners' claim that the proposal approved by the Commission is invalid on its face as irreconcilable with the Comprehensive Plan. It is the Commission that is responsible for balancing the Plan's occasionally competing policies and goals, subject only to deferential review by this court. *See Tenley & Cleveland Park, supra,* 550 A.2d at 341 ("[T]he Zoning Commission is the exclusive agency vested with responsibility for assuring that the zoning regulations are

not inconsistent with the Comprehensive Plan."). Where the Commission has fully addressed the applicable aspects, policies, and material issues regarding the Plan, this court will not substitute its own judgment for that of the Commission. *See Watergate, supra,* 953 A.2d at 1043 ("[T]he mere existence of substantial evidence contrary to [the Commission's findings] does not allow this court to substitute its judgment for that of the [Commission]."); *Rock Creek E. Neighborhood League v. District of Columbia Zoning Comm'n,* 388 A.2d 450, 451 (D.C.1978) ("Absent arbitrary and capricious action, we will not substitute our judgment for that of the Zoning Commission.").

■■■■■■ Moreover, even if a proposal conflicts with one or more individual policies associated with the Comprehensive Plan, this does not, in and of itself, preclude the Commission from concluding that the action would be consistent with the Comprehensive Plan as a whole. *Cf. Blagden Alley Ass'n v. District of Columbia Zoning Comm'n,* 590 A.2d 139, 147 (D.C.1991) (remanding for further consideration, rather than reversing, where the Commission did not provide "any discussion" of an apparently conflicting policy). The Plan is not a code of prohibitions; it is

an interpretive guide, which the Commission must consider holistically. It provides a broad *"statement of policy to guide future public decision[-]making." Tenley & Cleveland Park, supra,* 550 A.2d at 338 (quoting Report of the Committee of the Whole on Bill 5–282, District of Columbia Comprehensive Plan Act of 1984 (Jan. 17, 1984)) (emphasis in original) (internal quotation marks omitted). And "[a]lthough the Plan serves as an important policy guide, its legal mandate is more limited." *Id.* Except where specifically provided, the Plan is not "binding"; it is only an interpretive tool. *Id.* Its discrete elements "guide[,] but do not direct" the Commission's action, and it "do[es] not impose specific implementation techniques." *Id.* at 338–39. Accordingly, that some individual policies may be facially at odds with a particular zoning action is not necessarily dispositive; the Commission must still determine whether a proposed action would be consistent with the Plan as a whole.

### C.

■■■■■ We agree with the petitioners, however, that in this case the Commission did not resolve all of the outstanding material issues.[12] During the public hearings,

12. Although we agree with the petitioners that in this case, the Commission did not resolve all of the outstanding material issues, and notwithstanding the fact that some of the Commission's findings challenged by the petitioners appear to have been based entirely on proposed findings submitted by the developer (not an infrequent practice of courts and agencies), we reject the petitioners' implicit characterization of the Commission's decision as partisan, biased, or as having been made in bad faith. In its lengthy order, the Commission made some apparent errors and omissions, but it did not, as the petitioners assert, display a "cavalier disregard" of its responsibility to interpret and implement, objectively and fairly, the record before it or the Comprehensive Plan.

Over the course of the proceedings, the Commission paid close attention to the question whether the proposal was consistent with the Comprehensive Plan. For example, although OP offered its opinion—on multiple occasions—that the developer's application was consistent with the Plan, the Commission did not reflexively accept OP's submissions at face value. Rather, after receiving OP's initial report, at least three members of the Commission expressed concerns regarding the application's consistency with the Plan and its accompanying policy maps. Because of these concerns, the Commission delayed scheduling a public hearing on the application, and asked OP to supplement its report with additional explanation and analysis.

When the Commission finally did hold public hearings, it received and reviewed a

the petitioners raised a number of material issues, calling into question whether the application was consistent with the Comprehensive Plan. Based on our own review of the Commission's order and the record, we conclude that the Commission did not address or explain its resolution of three of these issues.

First, the petitioners called to the Commission's attention several alleged inaccuracies in OP's reports—in particular in its reproduction of the FLUM. During the public hearings, the petitioners argued that OP's FLUM reproduction inaccurately represented over half of the site as having been approved for moderate-density mixed use. They claimed that in fact, only 37.5% of the property was so designated, with the remainder reserved for low-density residential use. To illustrate this alleged error, the petitioners offered their own map, which according to them accurately reflected the FLUM designations. The Commission, however, never directly addressed this dispute. Instead, relying on OP's report, it simply found that the "project's density and height are not inconsistent with what the [FLUM] shows for over one-half of the [developer's] site."

We cannot, as the developer urges, simply assume that the percentage of the site devoted to moderate-density mixed uses was immaterial to the Commission's ultimate conclusion. True, the Commission recognized that this project would extend, at least to some degree, a mixed-use development into what the FLUM designated as a low-density residential area. But OP had already advised the Commission that it was required to balance the FLUM's designations with other aspects of the Plan, including the written elements and the GPM. As a reviewing court, we are not in a position to decide whether the Commission would have balanced these considerations in the same way if it had recognized that approval of the developer's application would have caused a greater incursion into low-density residential areas. *See Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 42 (D.C.1979) (holding that this court may not "fill [a] gap [in the Commission's findings] by inferring findings on a party's objections through inspection of the record, the agency's other findings, and the ultimate decision"). Accordingly, we conclude that the Commission must explicitly resolve the FLUM-designation dispute and explain whether, and how, its resolution of the issue affects its ultimate decision.

Second, the petitioners highlighted various written Plan policies in the Land Use and Upper Northeast Area Elements, and argued that the developer's application were on their face in conflict with these policies. We are persuaded that at least four of these policies merited the Commission's explicit attention: LU–2.1.6 (Teardowns),[13] LU–2.1.8 (Zoning of Low and Moderate Density Neighborhoods),[14] LU–2.3.1 (Managing Non–Residential Uses in

---

substantial amount of evidence, including the petitioners' own testimony and written submissions. Then, in its forty-four page final order, the Commission made ninety-five separate findings of fact and fifteen discrete conclusions of law. Far from displaying a "cavalier" attitude toward its duties, the Commission demonstrated its careful and impartial consideration of the evidence and the views of all concerned.

**13.** LU–2.1.6 provides: "Discourage the replacement of quality homes in good physical condition with new homes that are substantially larger, taller, and bulkier than the prevailing building stock." 10–A DCMR § 309.11 (2011).

**14.** LU–2.1.8 provides:

Discourage the zoning of areas currently developed with single family homes, duplexes, and rowhouses (e.g., R–1 through

Residential Areas),[15] and UNE–1.1.1 (Neighborhood Conservation).[16] Considered together, these policies express a preference for maintaining existing residential structures and neighborhoods. This project, however, contemplates the destruction and replacement of existing freestanding homes, and it would extend a mixed-use development into what was previously a low-density residential area. In light of this apparent conflict, we conclude that the Commission must recognize these policies and explain whether they are outweighed by other, competing considerations, and if so, why.

R–4) for multifamily apartments (e.g., R–5) where such action would likely result in the demolition of housing in good condition and its replacement with structures that are *potentially out of character with the exist-ing* neighborhood.
10–A DCMR § 309.13.

**15.** LU–2.3.1 provides:
Maintain zoning regulations and development review procedures that: (a) prevent the encroachment of inappropriate commercial uses in residential areas; and (b) limit the scale and extent of non-residential uses that are generally compatible with residential uses, but present the potential for conflicts when they are excessively concentrated or out of scale with the neighborhood.
10–A DCMR § 311.3 (2011).

**16.** UNE–1.1.1 provides: "Protect and enhance the stable neighborhoods of Upper Northeast, such as … Brookland…. The residential character of these areas shall be conserved, and places of historic significance, gateways, parks, and special places shall be enhanced." 10–A DCMR § 2408.2 (2011).

**17.** LU–1.3.1 states, in full:
Encourage the development of Metro stations as anchors for economic and civic development in locations that currently lack adequate neighborhood shopping opportunities and employment. The establishment and growth of mixed use centers at Metrorail stations should be supported as a way to reduce automobile congestion, improve air quality, increase jobs, provide a range of

The Commission did not cite or discuss any of these policies. Rather, it examined only one individual Land Use Element policy: LU–1.3.1 ("Station Areas as Neighborhood Centers"), and its discussion of that policy was incomplete. The Commission did not quote LU–1.3.1 in its entirety,[17] and it did not address, the policy's explicit preference for neighborhood conservation over economic and civic development. *See* 10–A DCMR § 306.10 (2011). The Commission also cited only one Upper Northeast Element Policy: UNE–2.6.1 (Brookland/CUA Metro Station Area). That policy, too, it quoted only in part,[18]

retail goods and services, reduce reliance on the automobile, enhance neighborhood stability, create a stronger sense of place, provide civic gathering places, and capitalize on the development and public transportation opportunities which the stations provide. *This policy should not be interpreted to outweigh other land use policies which call for neighborhood conservation. Each Metro station area is unique and must be treated as such in planning and development decisions. The Future Land Use Map expresses the desired intensity and mix of uses around each station, and the Area Elements (and in some cases Small Area Plans) provide more detailed direction for each station area.*
10–A DCMR § 306.10 (emphasis added). In its quotation, the Commission omitted the italicized portion, as had the attorneys for the developer in their proposed findings.

**18.** UNE–2.6.1 provides:
Encourage moderate-density mixed use development on vacant and underutilized property in the vicinity of the Brookland/CUA Metro station, including the parking lot east of the station. *Special care should be taken to protect the existing low-scale residential uses along and east of 10th Street NE, retain the number of bus bays at the station, and develop strategies to deal with overflow parking and cut-through traffic in the station vicinity.*
10–A DCMR § 2416.3 (emphasis added). The Commission, as had the developer, omitted the italicized language.

and the Commission did not address language directing that "special care" be taken to preserve existing low-scale residential uses. 10–A DCMR § 2416.3 (2011). While we have no reason to believe that these incomplete quotations reflected any lack of impartiality on the Commission's part, we do conclude that it is the responsibility of the Commission to recognize and assess the import of omitted portions, which are at least potentially in conflict with the project under consideration.

Third, the Commission did not discuss at all the designation of the site as a Neighborhood Conservation Area on the GPM. That designation requires that any change in such areas should be "modest in scale" and consist primarily of "scattered site infill housing, public facilities, and institutional uses." 10–A DCMR § 223.4 (1994). The Commission made no findings on this issue, but simply quoted OP's report to the effect that the GPM did not, in and of itself, "determine whether an application of a particular zoning designation is not inconsistent with the Comprehensive Plan." OP's report, however, offered a more nuanced analysis of this issue. It observed that the GPM expressed a preference for "intensifying development" on the north side of Monroe Street near the Brookland/CUA Metro Station, but it was not "clear that such development [was] preferred on the south side of Monroe Street," i.e., on the project site. Because of this lack of clarity, OP advised the Commission to balance the GPM, FLUM, and written Plan elements to determine the site's appropriate development intensity. In other words, OP's report apprised the Commission of a significant issue regarding the GPM. Because this issue remains unresolved, and because the designation of the property as a Neighborhood Conservation Area potentially conflicts with the developer's proposal, we conclude that the Commission is required to make a

finding as to whether the proposal is consistent with the GPM. It is not enough for the Commission to state that the GPM did not itself determine whether the application was consistent with the Plan. Rather, the Commission is required to make a specific finding as to whether the proposal is consistent with the GPM's designation of the site as a Neighborhood Conservation Area, and to explain whether, and if so how, that designation affects its decision. Cf. Georgetown, supra, 402 A.2d at 42 (noting that, in the absence of explicit findings by the Commission, this court cannot infer findings on material issues).

In light of what we see as the Commission's failure expressly to address these contested issues, we conclude that a remand for further consideration is required. In so concluding, however, we do not suggest that the Commission must exhaustively review, or even cite, every policy in the entire Plan; we hold only that it is insufficient to recite that a particular action is consistent with the Plan as a whole: "bare conclusion[s]" will not do. Blagden Alley, supra, 590 A.2d at 147. Our precedents require the Commission, when presented with a material contested issue, to address that issue and to explain its conclusion. See id.(remanding for further consideration where the Commission's order did not "include any discussion" of the contested issue); Georgetown, supra, 402 A.2d at 42 (holding that the Commission must "make written findings of 'basic facts' on all material contested issues").

Here, notwithstanding its overall careful evaluation of the proposal, the Commission did not give the required consideration to the specific contested issues that we have identified above. Accordingly, we remand the case for appropriate supplemental findings and related conclusions of law. Specifically, the Commission should:

1. Resolve the dispute regarding the FLUM designations, and determine whether the project is consistent with the Plan as a whole in light of its resolution of that issue;

2. Explain whether the proposal is consistent with the written Plan policies discussed above: UNE–1.1.1, LU–2.1.6, LU–2.1.8, LU–2.3.1, and with the portions of UNE–2.6.1 and LU–1.3.1 omitted from its quotation of these policies;

3. Make findings regarding the GPM's designation of the property as a Neighborhood Conservation Area, and determine whether the developer's application is consistent with the Plan in light of that designation; and

4. Make any other necessary findings of fact and conclusions of law, in accordance with this opinion.[19]

### Conclusion

For the foregoing reasons, the case is remanded to the Commission for additional findings of fact and conclusions of law as explained in this opinion.

*Remanded.*

---

19. The petitioners also argue that the Commission failed to address certain aspects of the Brookland/CUA SAP, but we are satisfied that the Commission adequately dealt with that issue. The Commission expressly found that the proposed development would "fully achieve[ ] the goals outlined" in the SAP, and would foster the "main street" environment the SAP envisioned. Before the Commission, petitioners' primary objection was that the SAP ostensibly limited new development in the area to a maximum height of fifty feet. The Commission noted this limitation, but found that, given the setbacks the developer included in its proposal, the "building's development area above [fifty] feet will be roughly equivalent to the development area that could be achieved" if no setbacks had been included. It based this conclusion at least in part on OP's advice, to which it was required to give "great weight." *See* 10–A DCMR § 2510.1 (1994). Thus, we conclude that the Commission sufficiently addressed this issue and that its finding was based on substantial evidence.