*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 21-AA-52

BELOVED COMMUNITY ALLIANCE, PETITIONER,

V.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

MCF WALP PHASE 1, LLC, INTERVENOR.

Petition for Review of an Order
of the District of Columbia Zoning Commission
(ZC16-19)

(Submitted December 3, 2021           Decided November 3, 2022)

*Aristotle Theresa* was on the brief for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time of submission, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Ashwin P. Phatak*, Deputy Solicitor General, filed a Statement in Lieu of Brief for respondent.

*Philip T. Evans* and *Cynthia A. Gierhart* were on the brief for intervenor.

Before GLICKMAN, MCLEESE, and DEAHL, *Associate Judges*.

GLICKMAN, *Associate Judge*: Beloved Community Alliance petitions for review of a Zoning Commission order approving the application of intervenor, MCF WALP Phase 1, LLC (MCF), to construct a residential apartment building as a planned unit development (PUD) on a vacant city block in downtown Washington, D.C. The Alliance consists of two churches located across the street from the project, First Rising Mt. Zion Baptist Church (First Rising) and Miles Memorial Christian Methodist Episcopal Church (Miles Memorial). In the proceeding before the Commission, the pastors of those two churches unsuccessfully opposed the application. They claimed the PUD would provide insufficient affordable housing, displace residents and reduce the diversity of the neighborhood, and exacerbate a problem of limited Sunday parking availability for the churches in its vicinity. In this court, the Alliance complains that the Commission failed to address their concerns properly and in light of applicable provisions of the Comprehensive Plan that guides land use planning in the District of Columbia[1] and related public policies. We conclude, however, that the record supports the Commission's determinations regarding these matters, and we therefore deny the petition for review.

---

[1] 10 D.C.M.R. subtit. A.

**I.**

On August 2, 2019, MCF filed its application for approval of a PUD to build a multi-family, mixed-income residential apartment building at 1200 5th Street NW. The site MCF proposed to develop is an entire city block situated between the Shaw and Mount Vernon Square neighborhoods. It is one block away from the Mount Vernon Square/Convention Center Metrorail station and is close to other public transportation options as well. The zoning designation of the block, RA-2, contemplates development with "predominantly moderate-density residential" uses.[2] Consistent with that designation, the surrounding area contains primarily residential housing (two-to-three story apartment buildings, garden apartment units, and rowhouses), along with several churches and low-density commercial uses.

MCF, the applicant, is an affiliate of Mid-City Financial Corporation (Mid-City), which is the owner of the site to be developed. In the late 1960s and early 1970s, Mid-City constructed 63 garden-style, market-rate rental apartments on the site, along with a surface parking lot for the residents of those apartments. By the time of MCF's PUD application, all the apartments were vacant and slated for

---

[2] 11-F D.C.M.R. § 300.3.

demolition. In response to questions from the Commission, MCF's executive vice-president explained that the company had stopped leasing the 63 garden apartments three years earlier, and that all the remaining tenants had moved out prior to the filing of the PUD application. MCF had covered the moving costs for tenants to relocate to other, newly renovated units in the same neighborhood.

The PUD application sought minor zoning flexibility (notably a higher lot occupancy than is permitted as of right in an RA-2 zone) in order to replace the 63 vacant units and surface parking for them by a modern apartment building with various residential amenities and a large underground garage. The building is to contain approximately 360 apartments ranging from studios to three-bedroom units. The underground garage is to have 103 parking spaces for cars and additional space for bicycles, including 121 long-term bicycle parking spaces.

The building is to have a maximum height of 50 feet plus a habitable penthouse (as is permitted by right in the RA-2 zone). With a gross floor area of approximately 246,000 square feet, the building would include two residential wings (a three-story north wing and a four-story south wing, each designed to be compatible with the residential and other structures adjacent to it), joined by a narrower two-story connection containing the "residential support and amenity

areas" and flanked by open courts to the east and west. In these and other design, architectural, and landscaping respects, the building is meant to fit in physically with the surrounding community.

For the life of the building, 12 percent of its gross residential floor area, approximately 41,153 square feet, is to be dedicated to about 41 inclusionary zoning units under the District's Inclusionary Zoning (IZ) Program. These are affordable housing units.[3] They will include three three-bedroom units and 11 two-bedroom units. The IZ Program is intended to "further the Housing Element of the Comprehensive Plan by increasing the amount and expanding the geographic distribution of adequate, affordable housing available to current and future residents," and to "mitigate the impact of market-rate residential development on the availability and cost of housing available and affordable to low- and moderate-income households."[4] Affordable housing provided in compliance with IZ requirements may be considered a public benefit supporting a PUD application

---

[3] Approximately 4,280 square feet of the inclusionary zoning space is to be set aside for households earning less than 50% of median family income (MFI), and the rest of the inclusionary space would be set aside for households earning less than 60% of MFI.

[4] 11-C D.C.M.R. § 1000.1(a), (d).

where (as in the present case) "it exceeds what would have been required through matter-of-right development under existing zoning."[5]

The PUD application was modified over time to address community and other concerns. In the proceeding before the Zoning Commission, the application was supported overall by the Office of Planning (OP) and other relevant District government agencies, and by the local Advisory Neighborhood Commission (ANC 6E) and many area residents who wrote letters or testified at the Commission hearing. However, the pastors of First Rising and Miles Memorial opposed the application (as did six other witnesses who are not parties to this appeal). As we discuss in more detail below, the two pastors expressed concerns that the affordable housing set asides were insufficient and the project would adversely affect the racially integrated character of the neighborhood by driving out "residents of African American descent."[6] They also objected that the building did not include enough parking for its anticipated residents and consequently would exacerbate a parking shortage affecting churches in its vicinity.

---

[5] 11-X D.C.M.R. § 305.5(g)(1).

[6] As petitioner's brief reiterates, one of the pastors asserted that the project amounted to "an act of ethnic cleansing" targeting "community residents of African American descent."

On April 27, 2020, the Commission approved the PUD application by a vote of four to one. Its forty-page order concluded, *inter alia*, that the PUD would be compatible with the area's RA-2 zoning and not inconsistent with the Comprehensive Plan considered as a whole; that it would further numerous Comprehensive Plan elements and components; and that the building would not result in any unacceptable impacts that are not capable of being mitigated or outweighed by the project's "high level" of public benefits. The public benefits that the Commission found included (but were not limited to) the provision of "high quality" housing "located near multiple transit options and key commercial corridors"[7]; "20% more affordable housing" in the building (measured by gross floor area) "than would otherwise be required under matter-of-right development . . . resulting in approximately 41 dedicated affordable housing units"; replacement of "a vacant and underutilized property with a new, multi-family, mixed-income building"; replacement of a surface-level parking lot with underground parking; and design, architecture, and landscaping features "that [would] improve the surrounding neighborhood to a significantly greater extent than would likely result from matter-

---

[7] The Commission was impressed that the project would significantly advance the Mayor's stated goal of creating 36,000 new residential units in the District by 2025, by supplying one percent of that target in a single site.

of-right development." We discuss below how the Commission responded to the particular concerns expressed by the pastors of First Rising and Miles Memorial.

## II.

The District of Columbia's Comprehensive Plan is "a broad framework intended to guide the future land use planning decisions for the District."[8] The Plan reflects numerous "occasionally competing policies and goals," which the Commission "is responsible for balancing . . . , subject only to deferential review by this court."[9]

As explained in the zoning regulations,

> [t]he purpose of the planned unit development (PUD) process is to provide for higher quality development through flexibility in building controls, including building height and density, provided that a PUD: (a) Results in a project superior to what would result from the matter-of-right standards; (b) Offers a commendable number or quality of meaningful public benefits; and (c) Protects and advances the public health, safety, welfare, and

---

[8] *Friends of McMillan Park v. D.C. Zoning Comm'n*, 211 A.3d 139, 144 (D.C. 2019) (internal quotation marks and citation omitted).

[9] *Durant v. D.C. Zoning Comm'n*, 65 A.3d 1161, 1167 (D.C. 2013).

convenience, and is not inconsistent with the Comprehensive Plan.[10]

Thus, a PUD application "generally requests that a site be rezoned to allow more intensive development, in exchange for which the applicant offers to provide amenities or public benefits which would not be provided if the site were developed under matter-of-right zoning."[11]  When considering a PUD application, the Zoning Commission is required to "judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case."[12]  Given the requirement of overall consistency with the Comprehensive Plan, "if a proposal conflicts with one or more individual policies associated with the Comprehensive Plan," the Commission must "recognize these policies and explain [why] they are outweighed by other, competing considerations."[13]

---

[10] 11-X D.C.M.R. § 300.1.

[11] *Blagden Alley Ass'n v. D.C. Zoning Comm'n*, 590 A.2d 139, 140 n.2 (D.C. 1991) (internal quotation marks and citation omitted).

[12] *Howell v. D.C. Zoning Comm'n*, 97 A.3d 579, 581 (D.C. 2014) (citation omitted).

[13] *Durant*, 65 A.3d at 1168, 1170.

In considering the proposal, the Commission is required to give "great weight" to the recommendation of the OP.[14] This requires the Commission to "make the findings necessary to justify its departures [if any] from OP's recommendations."[15] Similarly, the Commission must give "great weight" to the issues and concerns raised in the recommendations of the affected Advisory Neighborhood Commission.[16] This "requires acknowledgement of the [Advisory Neighborhood] Commission as the source of the recommendations and explicit reference to each of the Commission's issues and concerns."[17]

When reviewing an order of the Commission, "we start from the premise that the [Commission's] decision . . . is presumed to be correct, so that the burden of demonstrating error is on the . . . petitioner who challenges the decision."[18] Our

---

[14] D.C. Code § 6-623.04.

[15] *Sheridan Kalorama Hist. Ass'n v. D.C. Bd. of Zoning Adjustment*, 229 A.3d 1246, 1263 (D.C. 2020).

[16] D.C. Code § 1-309.10(d)(3)(A).

[17] *Id.*

[18] *Union Mkt. Neighbors v. D.C. Zoning Comm'n*, 197 A.3d 1063, 1068 (D.C. 2018) (internal quotation marks and citation omitted).

review does not involve "reassess[ing] the merits of the decision,"[19] as we recognize the Commission's "statutory role and subject-matter expertise [and] generally defer to the Commission's interpretation of the zoning regulations."[20]  Accordingly, we generally "must affirm the Commission's decision so long as (1) [the Commission] has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) [the Commission's] conclusions of law follow rationally from those findings."[21]

**III.**

## A.  The PUD's Provision of Affordable Housing and Its Effect on Community Stability and Diversity

In its petition for review, Beloved Community Alliance primarily faults the Commission for failing to acknowledge and properly address the PUD's allegedly insufficient affordable housing and adverse impact on the stability and diversity of the surrounding residential community.  Petitioner contends the Commission should

---

[19] *Id.* at 1067 (citation omitted).

[20] *Howell*, 97 A.3d at 581 (quoting *Durant*, 65 A.3d at 1166-67).

[21] *Durant*, 65 A.3d at 1167 (citation omitted).

have found the proposed building to be inconsistent with provisions in components of the Comprehensive Plan (the Near Northwest Area Element, the Convention Center Area Small Area Plan, and the Generalized Policy Map) recognizing the area's history as "a vibrant center of African American culture"[22] and "an economically and ethnically diverse residential neighborhood,"[23] and stating that development should protect the historic character and diversity of such areas.[24] Relatedly, petitioner contends that the Commission failed to give great weight to an OP recommendation that the PUD be required to provide an increased number of affordable inclusionary housing units.

In fact, however, the Commission explicitly addressed the pertinent requirements in the referenced components of the Comprehensive Plan, and it found the PUD to be consistent with them. The Commission also justified its decision to approve the PUD without demanding an increase in the affordable housing it would provide. We are satisfied that the Commission's findings are supported by

---

[22] 10-A D.C.M.R. § 2101.6.

[23] 10-A D.C.M.R. § 2111.1.

[24] 10-A D.C.M.R. §§ 223.5-223.7

substantial evidence in the record and that its legal conclusions follow rationally from its findings.

The Commission recognized and acknowledged that the Generalized Policy Map designates the subject property as being in a primarily residential Neighborhood Enhancement Area, where "[l]and uses that reflect the historical mixture and diversity of each community should be encouraged" and "overall neighborhood character should be protected as development takes place."[25] The Commission cited, as well, the requirement of the Near Northwest Area Element that "[e]conomic diversity must be protected, and programs to retain and add affordable housing are urgently needed."[26] The Commission acknowledged that the relevant Small Area Plan "encourages" new "mixed-income housing at and near Metro stations" and "redevelop[ment] with [an] equivalent/increased number of affordable residential units."[27]

---

[25] 10-A D.C.M.R. §§ 223.6-223.7.

[26] 10-A D.C.M.R. § 2107.2(a).

[27] *See* 10-A D.C.M.R. § 2111.5 ("Protect existing affordable housing within the Shaw/Convention Center area, and produce new affordable housing and market rate housing on underutilized sites. Use a range of tools to retain and develop affordable housing in the . . . area, including . . . inclusionary zoning . . . ."); *id.* at § 2111.7 ("Encourage mixed-income residential development with underground parking adjacent to the Shaw/Howard and Mount Vernon Square Metro stations,

Both the applicant, MCF, and the OP addressed the project's compliance with these policies. MCF explained, *inter alia*, that the PUD it proposed would not "change the existing [RA-2] zoning but rather [would] respect[] the existing patterns of development" by "replac[ing] outdated market-rate housing" and "revitalizing a currently undeveloped block . . . with a new, mixed-income residential building" containing "approximately 41,153 square feet of affordable units on a site where none currently exist." MCF pointed out that this would provide more affordable housing units than would suffice for a matter-of-right development. And MCF emphasized that "[t]he Building will not cause any unacceptable [housing market] impacts, but instead will have a positive impact on the housing market," among other reasons because (1) "[t]he creation of new housing units helps buffer increasing housing costs, by increasing the supply of housing stock," (2) "[t]he Property is currently vacant so there will be no adverse impacts in terms of displacing current residents of the Property," and (3) "[t]he inclusion of permanently affordable units

---

particularly on existing surface parking lots."). The recommendation that residential redevelopment in the area include an equal or greater number of affordable units is found in the Convention Center Area Strategic Development Plan, which the OP produced in 2006 and on which the Small Area Plan relies.

helps address the District's ongoing affordable housing shortage in an inclusive, mixed-income community."[28]

The OP generally supported the proposed PUD as consistent with the Comprehensive Plan and the policies supporting redevelopment of an underutilized site with a new apartment building without displacing existing residents. The OP agreed that the amount of proposed affordable housing would be a benefit to the surrounding neighborhood. The OP did, also, express its support for a suggestion made by the Department of Housing and Community Development (DHCD) that the set aside for inclusionary zoning units be increased from 12% to 15% of the building. But the OP did not explain why it supported that suggested increase (amounting to over 10,000 additional square feet of the building's residential space, by our calculation), and the record before us does not contain a reasoned justification for it. MCF did not agree to such an increase. It informed the Commission that, after studying the issue, it had determined that a 12% IZ set aside was the maximum amount the proposed building could sustain economically. No evidence to the contrary was presented. Moreover, MCF argued, its proposed 12% set aside was

---

[28] The applicant also predicted that the PUD would have "favorable economic impacts on the neighborhood" (that would contribute to stabilizing it) "through the introduction of a new residential use that contributes patrons for the existing businesses" there.

commensurate with IZ set asides in similar PUD applications the Commission had approved, and the 12% set aside would provide approximately 12,000 square feet more affordable housing than a matter-of-right building would need to furnish.

Advisory Neighborhood Commission 6E also supported the PUD application. Its resolution reported that the application satisfactorily addressed its concerns with respect to additional affordable housing (among other issues). The ANC did not call for an increase in the number of IZ units.

In its decision approving the PUD application, the Zoning Commission acknowledged the "displacement concerns" expressed by the pastors of First Rising and Miles Memorial. It concluded, however, "that the Building will not result in any unacceptable impacts with regard[] to housing or displacement for the reasons advanced by the Applicant and OP." This conclusion was supported by the evidence and the Commission's findings. As the Commission found, the project would not displace anyone from the site of the building, because that site was no longer occupied by anyone.[29] Nor would the project reduce the supply of affordable

---

[29] As the Commission found, MCF "began the process of ending the leasing of the existing 63 market-rate units on the property well in advance . . . of the

housing in the area; the 63 units to be demolished on the site all were market-rate.[30]

Rather, the PUD would *add* 41 new affordable-income IZ apartments in the area.

Quoting a then-recent decision of this court, the Commission pointed out that "mitigation of the potential displacement of low-income residents through gentrification and market pressures is taken into account in the Zoning Commission's IZ regulations," and that "the pressures of gentrification . . . can be mitigated through inclusionary zoning . . . rather than avoided by having underutilized property remain as it is."[31]

The Commission stated that it gave great weight to the OP's recommendations and the ANC's issues and concerns. However, while the Commission acknowledged

---

application," and it had covered moving costs for tenants to relocate to its other buildings in the neighborhood.

[30] Petitioner has argued that the Commission ignored the recommendation in the Convention Center Area Strategic Development Plan that residential redevelopment in the area include an equal or greater number of affordable units. But since none of the 63 units to be demolished were affordable units, this recommendation is inapplicable here, and it certainly would not call for the Commission to require the PUD to have 63 inclusionary units as petitioner has contended.

[31] *Cole v. D.C. Zoning Comm'n*, 210 A.3d 753, 762-63 (D.C. 2019) (internal quotation marks and footnote omitted) (upholding Commission's approval of a PUD application that set aside 8% of the residential gross floor area for inclusionary units).

OP's support for an increased percentage of inclusionary housing space, the Commission determined that neither OP nor DHCD conditioned their support for the PUD application on such an increase, and the Commission declined to require it. It concluded that MCF "ha[d] provided sufficient evidence that the 12%[] IZ proffer is the maximum that the Building can support and that the proffer is sufficient to qualify as a public benefit when considered against the flexibility requested by the Application."

We are satisfied that the Commission reasonably and properly concluded that the PUD's "new housing, both affordable and market rate, outweigh[ed] any potential . . . displacement impacts in the surrounding neighborhood," would not threaten the diversity of the community, and would further the area development policies and other goals of the Comprehensive Plan. The findings undergirding this conclusion are supported by substantial evidence in the record, as recounted above; indeed, we perceive no evidence to the contrary. Furthermore, we are satisfied that the Commission adequately justified its decision not to require the additional affordable housing supported by the OP. The Commission was entitled to credit the applicant's testimony that the suggested increase would be economically infeasible, and to do so without requiring "detailed financial information" to corroborate it —

"in particular given the absence of contrary evidence requiring greater specificity."[32]
Although "petitioner (and others) may believe that the [inclusionary zoning] set-aside is not sufficient, we have no authority to second-guess the Commission's judgment on such policy matters."[33]

## B. The PUD's Impact on Local Parking Availability

The Zoning Commission concluded that the PUD will not result in any unacceptable parking impacts, either for the neighborhood generally or, more specifically, for the churches in the vicinity. Petitioner contends that conclusion was not supported by substantial evidence. We disagree. The Commission relied on expert analyses and testimony from MCF's transportation consultant Gorove Slade, the review performed by the District Department of Transportation (DDOT), and the report of the OP. They were all in agreement, and no contrary analysis or evidence of a likely adverse effect on parking availability was submitted to the Commission.

In relying on the reasons advanced by Gorove Slade, DDOT, and OP, the Commission emphasized that the analyses "all concluded that the amount of

---

[32] *Friends of McMillan Park*, 211 A.3d at 150.

[33] *Cole*, 210 A.3d at 762 n.12.

[automobile] parking provided in the Building [(103 spaces)] is greater than what is required by the zoning regulations and sufficient to meet the demands of the Building at a ratio of no more than 0.3 parking spaces per residential unit." The Commission noted that the analyses "did not identify any parking impacts that would require mitigations," and it agreed with their conclusion that "[t]he Building's central location and access to multiple transit options including Metrorail, Metrobus, and significant bicycle infrastructure reduce the need for residents of the Building to have personal vehicles."

These determinations have a firm foundation in the record. The applicable zoning regulations required the building to furnish only about 60 parking spots in view of its location within a half mile (actually within a block) of the Mount Vernon Square/Convention Center Metro Station.[34] The PUD application proposed a significantly greater number of parking spots. In fact, as the Commission found, the 103 spots that MCF proposed for the building came close to DDOT's recommended

---

[34] *See* 11-C D.C.M.R. § 701.5 (Table C) (generally requiring multi-family residential buildings to provide one parking space for every three units) and § 702.1(a) (providing that the minimum parking space requirement shall be reduced by 50 percent for any site that is located within a half-mile of a Metro station). A 360-unit building within a half-mile of the Mount Vernon Square/Convention Center Metro Station therefore would be obligated to provide only 60 parking spaces (360 divided by 3 = 120; 50% of 120 = 60).

*maximum* parking ratio for sites like the PUD that are within a quarter mile of a Metro station.[35] The OP similarly supported the PUD's provision of 103 parking spaces, with the proviso that any design flexibility allowed by the Commission should "be limited to providing *less parking only*" (emphasis added). The Advisory Neighborhood Commission 6E Zoning Committee likewise concluded that the 103 parking spaces in the PUD garage would be sufficient due to the building's proximity to the Mount Vernon Square/Convention Center Metro Station.

In addition to being just a block from the Metro, the PUD location is approximately one block from both a Metrobus stop and a Capital Bikeshare station. "Overall," Gorove Slade found, the PUD site has "excellent pedestrian, transit, and bike accessibility." This positive assessment was not contradicted. Moreover, the PUD's provision of 121 long-term bicycle parking spaces in the underground garage also substantially exceeds what zoning regulations require.[36] The bicycle parking spaces (and other biking infrastructure) are part of the PUD's Transportation Demand Management (TDM) plan, which (with DDOT input and approval) contains

---

[35] The maximum ratio adopted by DDOT is meant to encourage the use of available non-automotive modes of transportation and thereby reduce adverse traffic and parking impacts. The PUD's compliance with this policy was one reason DDOT enthusiastically supported the application.

[36] *See* 11-C D.C.M.R. § 802.1 (Table C).

multiple elements to reduce the demand for single-occupancy vehicular demand during peak travel times and encourages the use of alternative transportation options. In testimony before the Commission, DDOT's representative described the TDM plan as "robust" and "sufficient to encourage non-auto modes."

As part of its assessment of the adequacy of the 103 parking spaces to be provided by the PUD, Gorove Slade utilized the Park Right DC Tool that DDOT created to produce site-specific residential parking demand estimates based (according to DDOT) on "a model using current local data of actual parking use correlated with factors related to the building and its surroundings."[37] Taking into account the location and characteristics of the PUD building (including the number of each size of apartment), the model projected parking utilization at the building to

---

[37] Petitioner objects that the "Park Right DC Tool is from 2014 and includes parts of the city that do not have 40 churches and a dire need for 'Sunday parking'." It is not clear that this assertion is accurate. There is scant if any evidentiary support in the record for the claim that the need for Sunday parking space is "dire," and no evidence that the Park Right DC Tool was unsuited for the area at issue here. In its report to the Commission on the results it obtained with the Park Right DC Tool, Gorove Slade quoted DDOT's explanation that the Tool's calculations are "based on a model developed from extensive field work on data collected mostly in the fall of 2014 and spring of 2015 on over . . . 90 multi-family buildings across the District." We are not persuaded that an expert transportation consultant erred by utilizing DDOT's publicly available model as part of its analysis in this case, or that the Commission should have discounted Gorove Slade's conclusions because they were corroborated by the Park Right DC Tool.

be in the range of 72-115 spaces. The projection characterized a parking supply of 103 spaces as "an oversupply." Gorove Slade's discussion of the Park Right DC Tool estimate noted that after the project is completed, there will be 47 on-street parking spaces on the building's block in addition to the 103 spaces in the garage. "Thus," Gorove Slade concluded, "if the parking demand for the Project ends up at the higher end of Park Right DC's range and exceeds 103, the on-street spaces immediately adjacent to the Project can easily accommodate the additional demand."

Petitioner's witnesses (the pastors of Miles Memorial and First Rising) expressed concerns that the PUD would impair the future ability of their parishioners to park in the neighborhood to attend church on Sunday mornings. While these concerns were not substantiated in the proceedings before the Zoning Commission, petitioner faults the Commission for failing to address the fact, recognized in the Convention Center Area Strategic Development Plan, that "[t]here are more than 40 religious institutions in the Study Area that have additional parking needs, primarily on Sundays, when the street right-of-way is used to double-park during services."[38]

---

[38] It should be noted that when the Convention Center Area Strategic Development Plan refers to a "Study Area" containing some 40 churches, it is describing a geographically extended area that is "generally referred to as Shaw, but [that] includes a number of neighborhoods identified by area residents." (The Study Area "is bounded by New York Avenue, Massachusetts Avenue, 12th Street, Vermont Avenue, U Street, Florida Avenue, and New Jersey Avenue.") For what it

However, in its order, the Commission acknowledged the character of the neighborhood, noting "[t]he blocks immediately surrounding the property contain primarily residential, religious-affiliated, and low-density commercial land uses," and specifically naming Miles Memorial, First Rising, and several other churches in the neighborhood. The Commission acknowledged and did not ignore their parking concerns. "With regard to the Churches' parking concerns" it concluded that "the Building will not result in unacceptable parking impacts for the reasons advanced by the Applicant and OP," in particular because (1) the Gorove Slade and DDOT analyses "did not identify any parking impacts that would require mitigations," and (2) "[t]he Building provides more than the required parking, especially as it is located in an area of the District well served by multiple transit options."[39]

We consider the Commission's findings supported by substantial evidence in the record. Simply put, in the absence of evidence to the contrary, it unquestionably was reasonable for the Commission to conclude that construction of an apartment

---

is worth, the Plan states that while "[o]n street parking is increasingly becoming an issue in the Study Area," there is "less competition for on-street parking" in the area east of 7th Street, which is where the PUD and petitioner's churches are located.

[39] On a separate but related issue, the Commission also found that the building "is designed to ensure that site circulation and loading activities will not negatively impact the surrounding residential and religious uses." Petitioner does not question this finding.

building with more than adequate underground garage parking of its own for all its occupants will not have a deleterious impact on Sunday morning parking for churches in its vicinity.

## IV.

For the foregoing reasons, we affirm the order of the Zoning Commission.

*So ordered.*