*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-AA-1000

BARRY FARM TENANTS AND
ALLIES ASSOCIATION, PETITIONER,

v.

DISTRICT OF COLUMBIA
ZONING COMMISSION, RESPONDENT,

and

A&R DEVELOPMENT CORPORATION, ET AL., INTERVENORS.[±]

FILED **04/26/2018**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Petition for Review of a Decision of the
District of Columbia Zoning Commission
(ZC-14-02)

(Argued September 28, 2016                    Decided April 26, 2018)

*Aristotle Theresa* for petitioner Barry Farm Tenants and Allies Association.

*Paul J. Kiernan* for intervenor A&R Development Corporation. *Kyrus L. Freeman* and *Kristina A. Crooks* were on the brief for A&R Development Corporation.

---

[±]    The District of Columbia Housing Authority and Preservation of Affordable Housing were the other intervenors.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, and *Richard S. Love*, Senior Assistant Attorney General, filed a statement in lieu of brief for respondent.

*George R. Keys, Jr.*, filed a statement in lieu of brief for intervenor Preservation of Affordable Housing, Inc.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[+] MCLEESE, *Associate Judge*, and KRAVITZ, *Associate Judge of the Superior Court of the District of Columbia*.[*]

Opinion for the court by *Chief Judge* Blackburne-Rigsby.

Concurring opinion by *Chief Judge* Blackburne-Rigsby at page 41.

BLACKBURNE-RIGSBY, *Chief Judge*:  This petition for review arises from a dispute surrounding a proposed redevelopment of the Barry Farm and Wade Road neighborhoods located in Southeast, Washington, D.C.  Petitioner Barry Farm Tenants and Allies Association ("BFTAA"), an association composed of some of the current residents of the Barry Farm and Wade Road apartments, opposes the planned redevelopment.[1]  On December 8, 2014, the District of Columbia Zoning

---

[+]  Chief Judge Blackburne-Rigsby was an Associate Judge at the time this case was argued.  Her status changed to Chief Judge on March 18, 2017.

[*]  Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

[1]  BFTAA was formed in 2012 and has at least twenty-five participating members.

Commission ("Commission")[2] issued an order approving a first-stage Planned Unit Development ("PUD") and related Zoning Map Amendment application for the redevelopment. The application was submitted by the District of Columbia government ("District"), District of Columbia Housing Authority ("DCHA"), A&R Development Corporation ("A&R"), and Preservation of Affordable Housing, Inc. ("POAH") (collectively, the "Applicant"). BFTAA now seeks review of the Commission's order, arguing that the Commission made several erroneous conclusions in its approval of the Applicant's PUD and rezoning application. Specifically, BFTAA argues that the Commission: (1) made findings, not supported by substantial evidence, on material disputes related to characteristics of the proposed development, such as building density and number of units; (2) failed to consider the loss of current amenities that residents enjoy as an adverse impact; and (3) erred in concluding that the Applicant's relocation process would avoid hardship or dislocation of current residents, and that

---

[2] The Commission filed a statement in lieu of brief, stating that it would rely on its orders in this matter, which became final on May 29, 2015 and August 14, 2015, and on the brief filed by intervenor A&R Development Corporation on July 28, 2016.

evaluation of the adequacy of the Applicant's relocation plan was outside of its jurisdiction.[3]

We conclude that the Commission did not fully address all contested issues as required by the zoning and redevelopment regulatory scheme. We vacate the Commission's order and remand this case for further proceedings as discussed in this decision.

---

[3] BFTAA also argues that the Commission improperly qualified its expert witness, Brett Williams, as an expert in history, rather than an expert in gentrification and relocation and that, as a result, Ms. Williams was denied the opportunity to discuss how forced relocation would affect Barry Farm residents. BFTAA waived this argument. At the hearing before the Commission on September 18, 2014, BFTAA proffered that it was introducing Ms. Williams as an expert "[t]o discuss the impacts of the dislocation process" and then agreed with Chairman Anthony Hood of the Commission that Ms. Williams would be qualified as an expert in history. There was no assertion from BFTAA that Ms. Williams should be qualified as an expert in any other field. Accordingly, BFTAA waived this issue before the Commission. *See Aziken v. District of Columbia Alcoholic Beverage Control Bd.*, 29 A.3d 965, 969 (D.C. 2011) ("[A]dministrative and judicial efficiency require that all claims be first raised at the agency level to allow appropriate development and administrative response before judicial review.") (internal quotation marks omitted). Furthermore, BFTAA suffered no prejudice from Ms. Williams's qualification as an expert in history. Ms. Williams was permitted to testify, without objection, to her opinion that low-income residents experience many adverse impacts from relocation and gentrification, including the loss of social networks, negative effects on education and income, and increased health problems. Ms. Williams also testified to her concerns that Barry Farm residents may not be able to return to their homes after relocation. Accordingly, regardless of Ms. Williams's qualification, she was able to give her opinion on the impacts of relocation and gentrification, and the potential effects of relocation on Barry Farm residents.

## Table of Contents

I. Factual and Procedural Background…………………………….……6

    A. History of Barry Farm……………………………………………….6

    B. The Redevelopment Regulatory Framework……………..……….7

    C. The PUD Process……………………………………………...……11

    D. The Redevelopment Plan and PUD Application……………...…12

    E. The Commission's Findings and Approval of the PUD…………14

II. Discussion……………………………………………….…………20

    A. Distribution of Density and the Proposed Cluster
       Development Approach……………………………….…………23

    B. Number of Units…………………………………………………27

    C. Affordability Mix……………………………………….………29

    D. Adverse Impacts Stemming from the Loss of
       Current Amenities…………………………………………………30

    E. The Relocation Plan………………………………...…33

III. Conclusion……………………………………………...…..…39

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. History of Barry Farm

After the Civil War, Barry Farm was purchased by General Oliver O. Howard on behalf of the Freedmen's Bureau so that former slaves could purchase lots on which to build their homes. Barry Farm currently consists of 432 public housing units and is zoned R-5-A, Low Density Residential, with a FAR of 1.0.[4] The buildings and density are evenly distributed, and residents currently enjoy individual rear and front yards, and ample open green spaces conducive to social gatherings. Barry Farm is part of Ward 8, which is predominantly African American, and has a high poverty rate. It has a rich cultural heritage, exemplified

---

[4] FAR (floor area ratio) is used to measure building density and is determined by "dividing the gross floor area of all buildings on a lot by the area of that lot." 11 DCMR § 199.1. To illustrate the meaning of FAR by examples, generally speaking, a FAR of 1.0 means that the developer is permitted to build a one-story building over an entire lot, or a two-story building over half of the lot, or a four-story building over one-fourth of the lot, and so on. A FAR of 2.0 means that the developer is permitted to build a two-story building over the entire lot, or a four-story building over half of the lot, and so on.

Thus, the higher the FAR, the denser the construction permitted on a lot. Limitations upon the FAR permitted on a site "provide a means of controlling building density." *Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n*, 979 A.2d 1160, 1168 n.12 (D.C. 2009) ("*Foggy Bottom II*").

by the various street names recognizing Civil War abolitionists and those who fought for the Union.

### B. The Redevelopment Regulatory Framework

The Zoning Commission is vested with the exclusive authority to enact zoning regulations in the District of Columbia, and must ensure that the regulations it enacts are not inconsistent with the Comprehensive Plan. D.C. Code §§ 6-621.01 (e), -641.01 (2012 Repl.); *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1166 (D.C. 2013) ("*Durant I*"). The Commission is also vested with the authority to review and approve redevelopment projects. 11 DCMR § 2403.

The Comprehensive Plan is "a broad framework intended to guide the future land use planning decisions for the District." *Wisconsin-Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 394 (D.C. 2011) (internal quotation marks omitted). The purposes of the Comprehensive Plan, amongst other things, are to "[d]efine the requirements and aspirations of District residents, and accordingly influence social, economic and physical development[,]" "[p]romote economic growth and jobs for District residents" and

"[a]ssist in the conservation, stabilization, and improvement of each neighborhood and community in the District." D.C. Code § 1-306.01 (b) (2012 Repl.).

The District of Columbia relies on a three-tiered system of city planning that includes (1) Citywide Elements, (2) Area Elements, and (3) Small Area Plans.[5] 10-A DCMR § 104. The Comprehensive Plan encompasses these first two tiers, and contains numerous components. One of these components, the Future Land Use Map ("FLUM"), "uses colorcoded categories to express public policy on future land uses across the city" and divides residential and commercial areas into four categories: Low Density, Moderate Density, Medium Density, and High Density. 10-A DCMR § 225.1-.11. The FLUM "carries the same legal weight as the Plan document itself." *Id.* § 225.1. The FLUM designates Barry Farm as Moderate Density Residential, a designation "characterized by a mix of single

---

[5] The Comprehensive Plan includes thirteen Citywide Elements which affect the city as a whole, such as land use, transportation, housing, economic development, and infrastructure. 10-A DCMR § 104.4. The Comprehensive Plan also includes ten Area Elements such as Capitol Hill, Central Washington, Far Southeast and Southwest, and Mid-City which comprise the entire District of Columbia. *Id.* § 104.5. The Small Area Plans supplement the Comprehensive Plan, "providing detailed direction for areas ranging in size from a few city blocks to entire neighborhoods or corridors." *Id.* § 104.8. The regulations contemplate the future development of additional Small Area Plans. *Id.* § 104.9.

family homes, 2-4 unit buildings, row houses, and low-rise apartment buildings." *Id.* § 225.4.

Policy FSS-2.3.1 is one of the policies under the Far Southeast and Southwest Area Element of the Comprehensive Plan. The Policy encourages the redevelopment of Barry Farm in a manner that "[e]nsures one-for-one replacement of . . . public housing[,]" "[c]reates additional opportunities for workforce and market rate housing[,]" and "[p]rovides new amenities such as community facilities, parks, and improved access to the Anacostia River and Anacostia Metro Station." 10-A DCMR § 1813 Policy FSS-2.3.1. This policy recognizes that "some increase in density will be required" to ensure one-for-one replacement but that densities should remain "in the moderate to medium range." *Id.*

The third tier, the Small Area Plans, are not part of the Comprehensive Plan and are developed for "geographic areas that require more focused direction than can be provided by the Comprehensive Plan." 10-A DCMR § 2503.1. Small Area Plans are to be interpreted in conjunction with the Comprehensive Plan, and if necessary, the Comprehensive Plan can be amended to ensure internal consistency with the Small Area Plans. *Id.* § 2503.3.

On December 19, 2006, the Council of the District of Columbia approved a plan to redevelop the Barry Farm and Wade Road neighborhoods in Southeast, Washington, D.C. into revitalized mixed-income, mixed-use communities. *See* 54 D.C. Reg. 35 (2007). With funding from the New Communities Initiative ("NCI"),[6] an Advisory Committee worked with the District to develop the Barry Farm/Park Chester[7]/Wade Road Redevelopment Plan ("Barry Farm Small Area Plan"), which includes both a "Physical Plan" to improve the neighborhood's "housing, public facilities, access to commercial and retail opportunities, urban design, parks and open space, and transportation system" and a "Human Capital Plan" to improve four priority areas: "[a]dult education and employment, [c]hild and youth development, [c]ommunity physical and mental health, and [p]ublic safety and security." *Id.* The Barry Farm Small Area Plan envisioned 1,110 units distributed over a thirty-seven-acre footprint, with one-third of the units to be dedicated as replacement public housing, one-third as affordable housing, and one-third as market-rate housing.

---

[6] The NCI is a District program aimed at transforming select public and low-income housing developments into mixed-income, mixed-use communities.

[7] Although the Park Chester apartments were included in the Barry Farm Small Area Plan, the Park Chester apartments are not included in the Applicant's PUD site.

## C.  The PUD Process

Prior to approval of a Planned Unit Development ("PUD") application, the Commission must "find that the proposed PUD is not inconsistent with the Comprehensive Plan and with other adopted public policies and active programs related to the subject site."  11 DCMR § 2403.4; *see also Watergate E. Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning Comm'n*, 953 A.2d 1036, 1051 (D.C. 2008).  The PUD process is a flexible zoning scheme that allows for "the development of large areas as a [single] unit." *Watergate*, 953 A.2d at 1040 (internal quotation marks omitted).  The overall goal of the process is to permit flexibility in the zoning regulations, so long as the PUD "offers a commendable number or quality of public benefits" and "protects and advances the public health, safety, welfare, and convenience."  11 DCMR § 2400.2; *see Wisconsin-Newark*, 33 A.3d at 391.  Applications to develop a PUD must be submitted to the Commission for approval.  *See* 11 DCMR § 2403.1.  Thereafter, the Commission must conduct a comprehensive public review of the PUD to assess whether the proposed project satisfies the PUD Evaluation Standards provided under 11 DCMR § 2403.  When deciding whether to approve a PUD application "the Commission shall judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of

development incentives requested, and any potential adverse effects according to the specific circumstances of the case." *Id.* § 2403.8.

### D. The Redevelopment Plan and PUD Application

In 2013, the District of Columbia Housing Authority ("DCHA"), in partnership with the District of Columbia, selected A&R Development Corporation ("A&R") and Preservation of Affordable Housing, Inc. ("POAH") (collectively, the "Applicant") to lead the redevelopment and help implement the goals of the Barry Farm Small Area Plan. The area set for redevelopment, known as the PUD site, is bounded by Sumner Road, S.E., to the north, Firth Sterling Avenue, S.E., to the west, Saint Elizabeths Hospital to the south, and Wade Road, S.E., to the east. The PUD site consists of (i) the Barry Farm residences, which include 432 low-income row houses, owned and managed by DCHA; (ii) the Wade Road Apartments, which include twelve low-income units, owned and managed by DCHA; and (iii) eight vacant properties, owned by the District. On February 20, 2014, in order to begin the redevelopment, the Applicant applied to the Commission for approval of the first-stage of its PUD. Within its application, the Applicant proposed to demolish the currently existing Barry Farm and Wade Road Apartments and replace the apartments with a mixed-use development "that will

bring new mixed-income housing, new public spaces, and new retail/service uses to the Anacostia neighborhood."

The Applicant also applied for a Zoning Map Amendment, requesting that the lots on the PUD site be rezoned in order to give the Applicant more flexibility with the height and density restrictions on the site and to permit commercial properties in certain areas. The PUD site was originally zoned R-5-A, which limited the maximum height for buildings or structures approved through the PUD process to sixty feet and the maximum density to 1.0 FAR. *See* 11 DCMR §§ 2405.1-2405.2.[8] The Applicant requested that the lots on the PUD site, along Sumner Road and Firth Sterling Avenue, be rezoned to the C-2-A Zone District and that the lots on the remainder of the property be rezoned to the R-5-B Zone District. In the C-2-A Zone District, which permits both residential and

---

[8] The Commission established and adopted new zoning regulations, which became effective on September 6, 2016. 11-A DCMR § 100.1, 100.3. Although the new regulations superseded the previous 1958 Zoning Regulations and zoning maps in full, the 1958 Regulations remain applicable to this petition for review. *See id.* § 100.4 (c) ("The 1958 Regulations, as amended, shall continue in full force and effect . . . [w]ith respect to any civil suit, action, or proceeding pending to enforce any right under the authority of the regulations repealed[.] [A]ny suit, action, or proceeding shall proceed with, and conclude under, the regulations in existence when the suit, action, or proceeding was instituted."). Accordingly, all citations to the zoning regulations in this opinion refer to the 1958 Zoning Regulations.

commercial properties, a PUD Applicant is able to construct buildings with a maximum height of sixty-five feet, and a maximum density of 3.0 FAR for residences and 2.0 FAR for commercial buildings. *Id.* In the R-5-B Zone District, which permits residential properties, a PUD Applicant is able to construct buildings with a maximum height of sixty feet, and a maximum density of 3.0 FAR. *Id.*

### E. The Commission's Findings and Approval of the PUD

The Commission held public hearings on June 16, June 19, and September 18, 2014, to consider the Applicant's PUD application and requested Zoning Map Amendment. Throughout the hearings, BFTAA[9] contended that the requested rezoning would result in higher density levels on the site that were inconsistent with the Comprehensive Plan, and that the Applicant's plan to construct 1,400 units on the site was inconsistent with the Barry Farm Small Area Plan's specification for 1,110 units to be constructed. BFTAA also argued that the

---

[9] At the hearing on June 16, 2014, BFTAA was originally denied party status upon the Commission's finding that it was not uniquely affected by the PUD application. However, at the subsequent hearing on June 19th, the Commission granted BFTAA's request for party status.

Applicant did not provide an adequate relocation plan for current residents and that the Applicant was not taking sufficient measures to avoid the dislocation of current residents.

Following the hearings, on December 8, 2014, the Commission voted unanimously to approve the Applicant's PUD application and subsequently issued its decision, Z.C. Order No. 14-02, which became final on May 29, 2015. In its order, the Commission found that the PUD "advances the purposes of [both] the Comprehensive Plan and the [Barry Farm] Small Area Plan."

The Commission approved the Applicant's request to rezone the lots on the PUD site from R-5-A to R-5-B and C-2-A, finding that the rezoning was not inconsistent with the Comprehensive Plan. In reaching this decision, the Commission noted first that the Comprehensive Plan's FLUM designates the PUD site as a "Moderate-Density Residential" area. The Commission found that under the Applicant's rezoning request, a majority of the PUD site would be rezoned to the R-5-B Zone District, and that this district is "specifically listed as a district that may be applied in the Moderate-Density Residential category." *See* 11 DCMR § 350.2 ("[I]n R-5-B, a moderate height and density shall be permitted."). With regard to the parcels that would be rezoned to C-2-A, the Commission

acknowledged that the C-2-A Zone District is applied in "low- and medium-density residential areas." *See* 11 DCMR § 720.3. However, the Commission emphasized that rezoning to C-2-A would "only [be] for the commercial portions of the PUD Site in order to encourage retail uses along Sumner Road and Firth Sterling Avenue," and that these commercial areas would constitute just "three percent of the total development." In addition, the Commission stressed that the FLUM is to be "interpreted broadly" and that the FLUM's guidelines acknowledge that "there may be individual buildings that are higher or lower than [the] ranges within each area." Overall, the Commission concluded that the proposed increase in density would be "distributed across the PUD site," and that the density levels were appropriate "given the PUD's consistency with many other elements of the Comprehensive Plan," including the Far Southeast and Southwest Area Element[10] and the Housing Element.[11]

---

[10] The Far Southeast and Southwest Area Element identifies Barry Farm as a community in which there is a need for future change and states that Barry Farm should not be left behind as the neighborhoods around it progress. 10-A DCMR § 1800.5. The Element seeks to address "[p]overty, unemployment, illiteracy, crime, and other social issues" and its priorities are "safer streets, better schools, more jobs, and improved housing choices[.]" *Id.*

[11] The Housing Element encourages, among other things, "the production of housing for low and moderate income households" and "efforts to transform distressed public and assisted housing projects into viable mixed-income neighborhoods[.]" 10-A DCMR §§ 504.6, 506.10.

The Commission also rejected BFTAA's argument that the PUD was inconsistent with the Barry Farm Small Area Plan because the Applicant proposed to construct more units than specified in the Barry Farm Small Area Plan. The Commission stated that although the Barry Farm Small Area Plan had "recommended the development of 1,110 units," the Applicant's proposal for 1,400 units "is consistent with the [Barry Farm] Small Area Plan's broader recommendations regarding the need for more housing." The Commission emphasized that the Barry Farm Small Area Plan "only provides supplemental guidance" for the redevelopment and that the Applicant's proposed number of units had been supported by reports from the Office of Planning and letters of support from then-Councilmember Marion Barry and then-Mayor Vincent Gray. Overall, the Commission concluded that the PUD would help to implement the majority of the Barry Farm Small Area Plan's recommendations, including recommendations for new retail and services, mixed-income housing, a central park and open spaces, and a new residential street-grid to link the neighborhood to surrounding communities.

With regard to the Applicant's process for relocating residents, the Commission found that the Applicant's relocation process is not inconsistent with the Comprehensive Plan's Policy FSS-2.3.1, which among other things,

encourages the redevelopment of Barry Farm in a manner that "[e]nsures one-for-one replacement of any public housing that is removed" and provides "measures to assist residents and avoid dislocation or personal hardship[.]" *See* 10-A DCMR § 1813. The Commission found that in compliance with this policy, the Applicant would "provide a one-for-one replacement of all [444] public housing units that are removed from the PUD Site." Specifically, the Applicant agreed to replace 344 public housing units in the Barry Farm and Wade Road neighborhoods and to provide another 100 replacement units off-site,[12] but still close to the residents' community. In addition, the Commission found that the Applicant would also "undertake an extensive relocation and return process to ensure that current residents have a place to live during redevelopment of the PUD Site and to guarantee that those residents can return to the PUD Site after redevelopment if they choose to do so."

In response to BFTAA's contention that the Applicant did not provide an adequate relocation plan for current residents, the Commission stated that the

---

[12] For the 100 off-site replacement units, the Commission found that "60 replacement units have already been constructed for Barry Farm families in Matthews Memorial Terrace, located at 2632 Martin Luther King Jr. Avenue, S.E., and Sheridan Station Phase I, located at 2516 Sheridan Road, S.E." and that "Sheridan Station Phase III is currently under construction and will deliver 40 additional replacement public housing units for Barry Farm families."

adequacy and specific measures of the Applicant's relocation plan is governed by the Uniform Relocation Act ("URA"). *See* 42 U.S.C. §§ 4601-55. The Commission concluded that because that URA does not confer any jurisdiction on the Commission, the Applicant's relocation process is outside of the Commission's jurisdiction. The Commission also stated that it was "requiring the Applicant to submit a relocation plan with the first second-stage PUD" and "a progress report regarding the status of the relocation process."

In addition, the Commission concluded that several benefits and amenities would result from the Project, in the categories of "Urban Design, Architecture, Landscaping and Open Space"; "Site Planning, and Efficient and Economical Land Utilization"; "Transportation Features"; "Employment and Training Opportunities"; "Housing and Affordable Housing"; and "Environmental Benefits." These benefits and amenities include, among other things, a "rational street grid with broad, landscaped sidewalks"; "parks and outdoor public amenities"; "a community-oriented retail corridor"; "a variety of housing types"; "access to public transportation"; and "employment opportunities." The Commission found that the amenities and benefits from the project were "reasonable tradeoffs" for the Applicant's requested flexibility with the heights and densities of the constructed buildings.

After the Commission approved the Applicant's PUD and rezoning application, BFTAA filed a motion for reconsideration, which was denied by the Commission on June 28, 2015. This petition for review followed.

## II.  DISCUSSION

Our review of an order issued by the District of Columbia Zoning Commission is "limited and narrow." *Wisconsin-Newark*, 33 A.3d at 388 (internal quotation marks omitted).  When reviewing an order from the Commission, we do not "reassess the merits of the decision, but rather [we] must determine whether findings supporting the decision are arbitrary, capricious or an abuse of discretion, not supported by substantial evidence." *Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n*, 639 A.2d 578, 584 (D.C. 1994) ("*Foggy Bottom I*") (internal quotation marks omitted).  We will uphold the Commission's decision "if the findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from [the Commission's] findings." *Wisconsin-Newark*, 33 A.3d at 388 (internal quotation marks omitted).

Pursuant to 11 DCMR § 2400.2, the Commission may "permit flexibility of development and other incentives, such as increased building height and density"

as long as "the project offers a commendable number or quality of public benefits and . . . protects and advances the public health, safety, welfare, and convenience." The Commission must also "find that the proposed PUD is not inconsistent with the Comprehensive Plan and with other adopted public policies and active programs related to the subject site [such as the applicable zoning regulations, the Future Land Use Map, the Barry Farm Small Area Plan, and the NCI]." 11 DCMR § 2403.4. The Commission can approve a PUD that is inconsistent with one or more such provisions if the provisions at issue are worded in mandatory terms, only if the Commission (1) concludes that disregarding one such provision is necessary to comply with one or more other such provisions and (2) explains why it is deciding to favor one such provision over the other such provision. *See Friends of McMillan Park v. District of Columbia Zoning Comm'n*, 149 A.3d 1027, 1034-35 (D.C. 2016). The Commission cannot simply disregard some provisions of the Comprehensive Plan on the ground that a PUD is consistent with or supported by other provisions of the Comprehensive Plan. *Id.*; *see also Durant I*, 65 A.3d at 1170 (stating that the Commission "must recognize these policies and explain [why] they are outweighed by other, competing considerations").[13]

---

[13] Nevertheless, we acknowledge that the PUD is in some respects consistent with the Comprehensive Plan, and that the PUD reflects some efforts to engage the current Barry Farm community in its development.

Moreover, the Commission must address each material contested issue of fact. *Dietrich v. Board of Zoning Adjustment*, 293 A.2d 470, 472-73 (D.C. 1972). And although the parties did not raise this issue, it is evident from the Applicant's proposed findings of fact in the record that the Commission's decision largely adopted nearly verbatim the Applicant's proposal. When this occurs, "[a] stricter review of the record is in order" to determine whether the "findings and conclusions ultimately represent" an independent determination. *District Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030, 1035 (D.C. 1980) (internal quotation marks omitted); *see also Durant v. District of Columbia Zoning Comm'n*, 99 A.3d 253, 257-58 (D.C. 2014) ("*Durant II*") (internal quotation marks omitted) (stating that "verbatim adoption of orders proposed by one of the parties . . . will trigger more careful appellate scrutiny and result in less deference to the ruling of the . . . administrative agency").

The Commission's order has numerous issues that have not been fully addressed, consistent with this standard of review, thus requiring us to vacate the order and remand the case for further proceedings.

### A. Distribution of Density and the Proposed Cluster Development Approach

BFTAA contends that low-income residents will disproportionately occupy the high-density units and that wealthier residents will occupy the lower-density parcels, thus failing to establish an actual mixed-income community. There is nothing in the record to support this assertion.

BFTAA also contends that the Applicant's distribution of density is not consistent with the Comprehensive Plan's Policy FSS-2.3.1, which suggests moderate- to medium-range densities for the Barry Farm area, and that the Commission erred in approving a PUD with a higher density. 10-A DCMR § 1813 Policy FSS-2.3.1.

Under the Applicant's plan, buildings on parcels 1A, 1B, 3, and 4 all have FARs in excess of those permitted for a C-2-A Zone District approved through the PUD process. 11 DCMR § 2405.2. Although the overall project FAR is within acceptable limits for the requested zoning, almost half of the proposed units will be built on parcels exceeding the requested zone's permitted FAR. The Commission concluded that "the R-5-B District for the PUD Site is not inconsistent with the Moderate-Density Residential Category [as denoted by the FLUM]," relying on the

fact that the "R-5-B Zone District is specifically listed as a district that *may* be applied in the Moderate-Density Residential category." (emphasis added). The Commission failed to explain how the *potential* for inclusion in the R-5-B category supports categorizing the proposed PUD as moderate density.[14] Moreover, the Commission also noted that "[t]he C-2-A District shall be located in low- and medium-density residential areas." Despite this fact, four of the six proposed buildings located solely in the C-2-A Zone District exceed the zone's permitted FAR under PUD standards.[15] 11 DCMR § 2405.2.

---

[14] We previously stated that "although buildings permissible in an R-5-B district may exist in moderate-density residential neighborhoods, 10-A DCMR § 225.4, that does not mean that such buildings are themselves . . . moderate-density in character" and that "moderate-density residential neighborhoods may contain some buildings that, considered in isolation, would not be moderate-density uses, such as existing multi-story apartments, many built decades ago when the areas were zoned for more dense use (or were not zoned at all)." *Durant v. District of Columbia Zoning Comm'n*, 139 A.3d 880, 884 (D.C. 2016) ("*Durant III*") (internal quotation marks omitted).

[15] Parcel 1A has a proposed FAR of 4.43 and Parcel 1B has a proposed FAR of 4.36. A building in the C-2-A Zone District, as a matter of right, shall not have a FAR in excess of 2.50. 11 DCMR § 771.2. However, buildings in the C-2-A Zone District, when approved through the PUD process, typically cannot have a FAR greater than 3.0 (which may be increased to 3.15 in certain circumstances). 11 DCMR §§ 2405.2-.3; *see Durant III, supra* note 14, 139 A.3d at 884 (explaining that a proposed building with a FAR of 3.31 in an R-5-B zone was "far above" the 1.8 limit imposed as a matter of right, and even exceeded the 3.0 limit imposed through the PUD process).

Additionally, the Applicant requests relief from the 60% maximum lot occupancy parameter permitted for the R-5-B and C-2-A Zone Districts for all but two of the eighteen parcels slated for residential development. 11 DCMR §§ 403.2, -772.1. The Commission concluded that the "lot occupancy requirements would adversely impact the layout and design of the PUD, and would hinder the Applicant's ability to provide a reasonable footprint and layout for the proposed buildings[,]" yet provided no rationale to support its conclusion that the PUD's layout and design would be adversely affected.

In response to BFTAA's contention that the Commission must explore other feasible alternatives, the Applicant argues that the Commission was not required to consider the feasibility of all possible alternatives. In another recent case, neighborhood associations petitioned for review of a Commission order approving American University's ("AU") plan to expand the size of its campus to accommodate climbing enrollment. *Spring Valley-Wesley Heights Citizens Ass'n v. District of Columbia Zoning Comm'n*, 88 A.3d 697, 704 (D.C. 2013). Local residents feared that the campus expansion would increase problems with noise, traffic, trash, and student misconduct, and argued that the Commission failed to consider alternative locations for AU student housing. *Id.* at 708, 715. We stated that "[i]t was not the function of the Commission to consider all the possible

alternatives to development of the East Campus; its only task was to evaluate whether the proposed site will become objectionable to neighboring properties." *Id.* at 715 (internal quotation marks omitted). The case currently before us is easily distinguished from *Spring Valley-Wesley Heights*—while we recognize that the Commission is not charged with evaluating all possible alternatives, it must make findings on all contested issues. *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 42 (D.C. 1979); *see also D.C. Appleseed Ctr. for Law & Justice v. District of Columbia Dep't of Ins., Sec., and Banking*, 54 A.3d 1188, 1216 (D.C. 2012) ("The requirement that the decision be fully and clearly explained . . . is necessary for meaningful judicial review of and deference to the agency's decision."). Here, BFTAA has a tenable argument that the distribution of density is in tension with the governing zoning regulations and policies, and that the Comprehensive Plan does not require the proposed clustering of medium- to high-density buildings on the western and northwestern parts of the PUD site. The Commission does not adequately address this possibility, but "finds that the proposed cluster development approach to the PUD Site is an essential part of fulfilling the Moderate-Density Residential designation of the Future Land Use Map, while at the same time achieving other elements of the Comprehensive Plan." The record, however, does not contain a substantial basis to support the conclusion that the "cluster development approach" is necessary for effectuating the policy

goals of the Comprehensive Plan, especially given the possibility that the units could be evenly distributed throughout the PUD site. We recognize that the Commission has authority under the PUD process to approve localized areas of higher density and lot occupancy. E.g., 10-A DCMR § 226.1 (c); 11 DCMR § 2405.2 (PUD FAR requirement expressed in terms of the "project area"). But we conclude that the Commission must more fully explain its decision to approve a development characterized by high-density clusters that considered in isolation would substantially exceed the density suggested by Policy FSS-2.3.1 of the Comprehensive Plan.

## B. Number of Units

BFTAA argued that the Commission erred when it approved 1,400 units, a deviation from the Barry Farm Small Area Plan's recommendation for 1,110 units, without substantial evidence demonstrating that this deviation was necessary.

The Commission concluded that additional units, beyond what was specified in the Barry Farm Small Area Plan,[16] were "necessary to leverage and allow for the successful development of the replacement public housing and affordable housing units proposed for the PUD site." The Commission's order noted that, on September 5, 2014, the Applicant submitted information on the infrastructure costs associated with the development. In this supplement, the Applicant concluded that reducing the number of units would increase the fixed costs per unit, making it difficult to finance the project. Based on similar developments, the Applicant estimated that each unit would cost $250,000 to build, and thus, the replacement units alone would cost over $86 million. Moreover, the Applicant estimated that the infrastructure costs, which were mostly fixed, would exceed $51 million, placing combined fixed costs for the replacement units and infrastructure at over $137 million. Although the replacement units would be partially subsidized, such a subsidy would only cover operating expenses. As such, revenue from the

---

[16] In a number of places, the Commission discounts the weight of the Barry Farm Small Area Plan to minimize the importance of inconsistencies with its policies, stating, for example, that they are "not required to follow the Council-approved small area plan since it is not an amendment to the Comprehensive Plan." However, under 11 DCMR § 2403.4, "[t]he Commission shall find that the proposed PUD is not inconsistent with the Comprehensive Plan and with other adopted public policies and active programs related to the subject site." Additionally, under 10-A DCMR § 104.8, the Small Area Plans are denoted as "providing detailed direction" to "supplement the Comprehensive Plan."

market-rate units would be needed to cover the large infrastructure costs. Reducing the number of total units would increase the fixed infrastructure costs per unit, making the project more difficult to finance.[17] Thus, the record contains a sufficient factual basis to support the need for additional units beyond what was specified in the Barry Farm Small Area Plan, and the Commission did not err in concluding that economic necessity justified a departure from the Small Area Plan's recommendation for 1,110 units.

## C. Affordability Mix

The Commission also concluded that the "Applicant's proposed mix of housing types and affordability levels is generally consistent with the [Barry Farm]

---

[17] BFTAA contends that the Commission accepted the development costs cited by the Applicant without sufficient fact-finding. BFTAA, however, did not present any reports or testimony to challenge the financial analysis underlying the conclusion that the project would be difficult to finance if the unit count were reduced. We previously concluded that similar "unchallenged submissions and testimony constituted substantial evidence that a reasonable mind might accept as adequate to support a conclusion." *D.C. Library Renaissance Project/West End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 125 (D.C. 2013) (internal quotation marks omitted). Here, we similarly find that there was a basis in the record for concluding that the proposed number of units was necessary to finance the development given the large fixed infrastructure costs to "be borne in large part by . . . revenue from the market rate units developed at the PUD site."

Small Area Plan's recommendations to redevelop . . . with approximately one-third public housing units, one-third workforce units, and one-third market-rate units." The Commission noted the Applicant's proposed distribution: 24% replacement units, 20% affordable rental/homeownership, 20-30% market rental, and 20-30% market homeownership. The Commission erred in concluding that the proposed distribution of affordability levels was "generally consistent" with the Barry Farm Small Area Plan's proposal of one-third market rate units when the majority of units would be market rental or market ownership; one-third is not "generally consistent" with a majority percentage. Given the inconsistency between the Barry Farm Small Area Plan's suggested unit affordability mix and the Applicant's proposed distribution, the Commission must provide an explanation that satisfies their obligation under *Friends of McMillan Park*. 149 A.3d at 1035.

### D.  Adverse Impacts Stemming from the Loss of Current Amenities

The Commission addressed a number of the specific "public benefits" that would inure to the development in the areas of design, architecture, and preservation of open space; site planning and land utilization; transportation and traffic management; employment and training opportunities; housing; and the environment. The most important of these benefits involved the creation of new

housing for different income levels, which would contribute to a "vibrant, diverse, and functional neighborhood." Other benefits included a "rational street grid with broad, landscaped sidewalks"; "parks and outdoor public amenities"; "a community-oriented retail corridor"; "a variety of housing types"; "access to public transportation"; and "employment opportunities." The Commission also detailed many of the current conditions at the PUD site, describing it as an area that "has not seen significant improvement or redevelopment for over half a century."

Despite these findings, the Commission also needed to address the specific adverse impacts raised by Barry Farm residents, such as the loss of green space and personal yards, the addition of high-density apartment buildings, the disruption of existing social support networks, gentrification of their existing community, the net loss of 100 public housing units on the PUD site, and the loss in availability of 440 currently existing public housing units during the development process. The Commission also viewed some of the project amenities from a perspective that disregarded the existing community; for example, the Commission viewed the "substantial amount of open space" and "central park" as project amenities, when residents currently enjoy an even greater amount of open space.

The D.C. Office of Planning's ("DCOP") views are statutorily entitled to "great weight." D.C. Code § 6-623.04 (2012 Repl.). Although the DCOP opined that the PUD was not inconsistent with the Comprehensive Plan or Barry Farm Small Area Plan, their representative's testimony on June 19, 2014 suggested a gap in knowledge with regard to the current Barry Farm community, which precluded a comprehensive understanding of all adverse effects. For example, when asked about "the demographics of the people who live at Barry Farms now," a DCOP representative stated, "I don't know." Similarly, when asked "what kind of gentrification pressures a project of this magnitude and change in economics will bring to those currently living at Barry Farms, as well as onto the surrounding Ward 8 communities?" the DCOP representative stated, "I'm not sure exactly what you're trying to get at."

In failing to make any findings on the current amenities Barry Farm residents enjoy, and in failing to consider the loss of these amenities as an adverse effect, the Commission failed to make adequate findings "on each contested issue of fact" as required under D.C. Code § 2-509 (e) (2012 Repl.)[18] to reach their

---

[18] D.C. Code § 2-509 (e) states:

(continued . . .)

stated conclusion that any adverse impacts were outweighed by the benefits of the PUD.

### E.  The Relocation Plan

The Commission concluded that the relocation process was governed by the URA, which requires relocation payments and programs for individuals displaced by a federal project.  Because the URA did not confer jurisdiction on the Commission, the Commission concluded that the relocation process was outside its jurisdiction.  This conclusion was erroneous in light of the URA's language explaining that the URA is meant to run concurrently with local government

---

(. . . continued)

> Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence. A copy of the decision and order and accompanying findings and conclusions shall be given by the Mayor or the agency, as the case may be, to each party or to his attorney of record.

actions, not in place of them.[19]  As such, the Commission needed to consider any local policies addressing relocation.

The Comprehensive Plan, which "addresses social and economic issues that affect and are linked to the development of the city and our citizens[,]" is one such local policy that the Commission must consider.  10-A DCMR § 100.14.  Further, under 11 DCMR § 2403.8, the Commission must consider "any potential adverse effects" when evaluating a PUD application.  *See Friends of McMillan Park*, 149 A.3d at 1037 (stating that the Commission must address the "risk that neighborhood residents would be displaced" in evaluating "whether a PUD would have adverse effects"); *Spring Valley-Wesley Heights*, 88 A.3d at 707 (recognizing that "resident displacement" from a university's "expanded presence" in the local neighborhood could "constitute an objectionable condition" justifying measures aimed at mitigating such effect).  If a developer argues that there is a plan in place to ameliorate such potential adverse impacts, then the Commission must assess the

---

[19]  42 U.S.C. § 4625 (d) states: "The head of a displacing agency shall coordinate the relocation activities performed by such agency with other Federal, State, or local governmental actions in the community which could affect the efficient and effective delivery of relocation assistance and related services."

adequacy of that plan in order to gauge the overall adverse impact of the proposed PUD.

In *Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739, 750-51 (D.C. 1990), we found that the Board of Zoning Adjustment ("BZA") erred in concluding that it lacked jurisdiction to consider the potential adverse impacts of a proposal on the surrounding neighborhood. Although the BZA lacked the authority to approve traffic-related proposals or evaluate building height restrictions, the governing regulations required the BZA to evaluate whether the proposal "is likely to become objectionable to neighboring property because of noise, traffic, . . . and other conditions." *Id.* at 751. Similarly, in failing to consider the adequacy of the relocation plan, the Commission failed to consider a potential adverse impact of the PUD on the Barry Farm community. Even if the Commission does not have authority to order or administer relocation services, it does have the obligation to consider what services are going to be provided, in order to assess the potential adverse impacts of the PUD. The Commission's failure to evaluate this plan as part of its first-stage approval means that the Commission did not address all material contested issues, necessitating a remand.

Moreover, the Commission's obligation to consider the relocation plan is consistent with numerous other policies. Policy FSS-2.3.1 of the Comprehensive Plan ensures "measures to assist residents and avoid dislocation or personal hardship[.]" The Commission concluded the Applicant's relocation plan is consistent with this policy because the Applicant "will support current residents." Although "support" may speak to FSS-2.3.1's "measures to assist residents," "support" does not encompass efforts to "avoid dislocation."[20] In this context, "dislocation" refers to the removal of current residents from the Barry Farm site. The relocation plan envisions moving Barry Farm residents to a new site during construction; it presents no discussion of whether it would be possible to "avoid dislocation" and allow Barry Farm residents to remain on site as part of a phased construction plan.[21]

---

[20] Dislocation is defined as "disturbance from a proper, original, or usual place or state." Dislocation, http://en.oxforddictionaries.com/definition/dislocation (last visited Jan. 18, 2018).

[21] We do not construe the "or" as offering the Applicant a choice between implementing measures to "avoid dislocation" or measures to "avoid hardship" as dislocation is a hardship. *See Young v. U-Haul Co.*, 11 A.3d 247, 250-51 (D.C. 2011) (stating that "where a statute contains two clauses which prescribe its applicability, and the clauses are connected by a disjunctive . . . the statute . . . will apply to cases falling within either of them" but that "basic principles of statutory construction require that the actual language of a statute be ignored or revised to avoid the absurdity that would result if it were read literally") (internal quotation marks omitted).

Similarly, the NCI emphasizes the need to build new affordable housing units prior to the destruction of the units being replaced. However, only 100 off-site replacement units will be completed prior to the demolition of Barry Farm, and thus, the public housing stock will suffer a net loss of 344 units during the time it takes to construct the replacement units. Additionally, the Applicant states that the "PUD will replace one-for-one the existing affordable housing units on the Barry Farm site[,]" consistent with the one-for-one guiding principle of the NCI, when the site will actually suffer a net loss of 100 public housing units. Although the Commission makes references to the NCI, the Commission fails to explain how the PUD is actually consistent with its policies.

Moreover, we note a fundamental dispute between the Commission's conclusion that the Applicant will "guarantee that [current residents] can return to the PUD Site after redevelopment if they choose to do so." Given that 100 of the units are being built off-site and 380 families currently reside on the PUD site, the Applicant cannot reasonably make this promise when only 344 replacement units are being built on-site. The Commission must reconcile this dispute in light of the possibility that more than 344 families wish to return to the PUD site, as they have been promised.

For the hundreds of families that currently live at Barry Farm, the relocation issue is central to their everyday lives. [22] Given the dramatic effect that a forced relocation can have on a family's well-being, such families are entitled to some semblance of predictability. For Barry Farm residents, the relocation plan must be attuned to the realities of the D.C. housing market, and sensitive to the fact that many residents in Ward 8 have already been displaced from other parts of the District. Concerns were raised by witnesses at the June 19, 2014 hearing about other redevelopment projects that have failed to deliver promised low-income housing replacement units, and there are currently insufficient public housing units available for all the Barry Farm residents who will be displaced, which will require that many of them obtain vouchers through the HUD Housing Choice Voucher program.

In remanding this case, we are not necessarily holding that the development may not go forward on this site, but rather, are simply requiring that the Commission give fuller consideration to and explain its determinations on the

---

[22] At the July 28, 2014 Commission meeting, Chairman Anthony J. Hood stated that 100% of Barry Farm residents were concerned about what would happen to them once the Applicant started rebuilding Barry Farm. He further explained that the Applicant needed to offer more details, given the impact of the PUD on "people's lives and where they live."

issues that we have identified, in accordance with the zoning and redevelopment regulatory scheme.

## II. CONCLUSION

On remand, the Commission must:

(1)  Explain its decision to approve a development characterized by high-density clusters that exceed the density suggested by Policy FSS-2.3.1 of the Comprehensive Plan;

(2)  Explain the inconsistency between the Barry Farm Small Area Plan's suggested unit affordability mix and the Applicant's proposed distribution;

(3)  Address the specific adverse impacts raised by Barry Farm residents and consider the loss of their current amenities as an adverse effect;

(4)  Address the adequacy of the relocation plan in order to gauge the overall adverse impact of the proposed PUD; and

(5)  Reconcile the dispute between the conclusion that the Applicant will "guarantee that [current residents] can return to the PUD Site after redevelopment if they choose to do so" and that fact that there will be insufficient housing on the PUD site to accommodate all 380 families, should they wish to return.

Accordingly, we vacate the Commission's order and remand this case for further proceedings.

*So ordered.*

BLACKBURNE-RIGSBY, *Chief Judge*, concurring:  The District of Columbia's zoning laws are intended to preserve the character of a community and ensure that new development is compatible with the many purposes of the Comprehensive Plan.[1]  The District of Columbia Court of Appeals does not write these laws and regulations, but is charged with interpreting them.[2]  While the laws and regulations

---

[1]  The purposes of the District elements of the Comprehensive Plan for the National Capital are to:

> (1) Define the requirements and aspirations of District residents, and accordingly influence social, economic and physical development;
> (2) Guide executive and legislative decisions on matters affecting the District and its citizens;
> (3) Promote economic growth and jobs for District residents;
> (4) Guide private and public development in order to achieve District and community goals;
> (5) Maintain and enhance the natural and architectural assets of the District; and
> (6) Assist in the conservation, stabilization, and improvement of each neighborhood and community in the District.
> D.C. Code § 1-306.01 (b) (2012 Repl.).

[2]  In effect, the legislative, executive, and judicial branches all have a role in the zoning process.  The Zoning Commission is a five-member independent body, created by statute, that is charged with preparing, adopting, and amending the Zoning Regulations and Zoning Map in a manner not inconsistent with the District of Columbia's Comprehensive Plan, which can be amended through the legislative process with executive approval.  The Zoning Commission consists of the Architect of the Capitol, the Director of the National Park Service, and three members appointed by the Mayor, subject to Council approval.  D.C. Code

(continued . . .)

may seem burdensome and in some instances, may restrict development, the laws provide the legal framework that this court is required to use when analyzing an appeal from the Zoning Commission.[3]

Our review of a Zoning Commission order is complicated because we are obligated to consider a vast array of statutes and regulations.[4]  Under 11 DCMR

_____

(. . . continued)
§ 6-621.01 (2012 Repl.).  Another independent agency, the Office of Zoning, "provide[s] professional, technical, or administrative staff assistance to the Zoning Commission."  D.C. Code § 6-623.01.

[3]  Some zoning cases have gone through an extended process on appeal to ensure legal compliance with this statutory and regulatory scheme (i.e. *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161 (D.C. 2013) ("*Durant I*"); *Durant v. District of Columbia Zoning Comm'n*, 99 A.3d 253 (D.C. 2014) ("*Durant II*"); and *Durant v. District of Columbia Zoning Comm'n*, 139 A.3d 880 (D.C. 2016) ("*Durant III*")).

[4]  For example, in this case we must consider, among others, any relevant provisions of 10-A DCMR §§ 100-2520 (Comprehensive Plan); 11 DCMR §§ 100-3591 (Zoning); D.C. Code §§ 1-306.01-.45 (2012 Repl.) (Comprehensive Plan); D.C. Code §§ 6-621.01-623.04 (2012 Repl.) (Zoning and Zoning Commission); and D.C. Code §§ 6-641.01-.10 (2012 Repl.) (Zoning Regulations; Board of Zoning Adjustment).  Although the Zoning Commission established and adopted new zoning regulations, which became effective on September 6, 2016, all citations in this opinion refer to the 1958 Zoning Regulations, which remain applicable to this petition for review.  *See* 11-A DCMR § § 100.4 (c) ("The 1958 Regulations, as amended, shall continue in full force and effect . . . [w]ith respect to any civil suit, action, or proceeding pending to enforce any right under the authority of the regulations repealed[.] [A]ny suit, action, or proceeding shall

(continued . . .)

§ 2403.4, the Zoning Commission must "find that the proposed PUD [Planned Unit Development] is not inconsistent with the Comprehensive Plan and with other adopted public policies and programs related to the subject site [such as the applicable zoning regulations, the Future Land Use Map, and in the instant case, the Barry Farm Small Area Plan, and the New Communities Initiative]." In this case, the Small Area Plan, developed in 2006, set out very specific parameters for the proposed number of housing units (1,110) and housing unit affordability mix, yet stated that an unmet financial gap, then estimated at $128 million, existed. More than a decade later under the current statutory and regulatory scheme, the Zoning Commission, by law, must still find that the proposed PUD is not inconsistent with the Small Area Plan's parameters, even if the original Small Area Plan may no longer be economically feasible due to the passage of time. If the Zoning Commission finds that the PUD is inconsistent with the Small Area Plan, the Commission must explain why the policy in the Small Area Plan is "outweighed by other, competing considerations . . . ." *Durant I,* 65 A.3d at 1170. The detailed nature of the Small Area Plan can lead to numerous instances in which potential inconsistencies between the Small Area Plan and other governing

---

(. . . continued)

proceed with, and conclude under, the regulations in existence when the suit, action, or proceeding was instituted.").

policies may arise. In such instances, the Commission is required to make precise findings explaining why one policy is outweighed by another, competing policy. In the instant case, for example, if the Small Area Plan had relied on more general terms (i.e. an intention to build between 1,000-1,500 units rather than the precise number of 1,110), there might be greater opportunities to harmonize Small Area Plans and other zoning regulations with proposed Planned Unit Developments.