*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-780

UNION MARKET NEIGHBORS, PETITIONER,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

GALLAUDET UNIVERSITY and JBG/6TH STREET ASSOCIATES, LLC, INTERVENORS.

Petition for Review of an Order
of the District of Columbia Zoning Commission
(ZC-15-24A)

(Argued November 13, 2018                    Decided March 28, 2019)

*Aristotle Theresa* for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Stacy L. Anderson*, Acting Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, filed a statement in lieu of brief for respondent.

*Philip T. Feola*, with whom *Christine Roddy* was on the brief, for intervenors.

Before FISHER, THOMPSON, and EASTERLY, *Associate Judges*.

FISHER, *Associate Judge*:    This dispute arises out of the proposed

development of four parcels of land in the Union Market/Gallaudet University

neighborhood. The District of Columbia Zoning Commission ("Commission") approved intervenors' first-stage application for a planned unit development ("PUD") of that property. Petitioner, a citizens' association, challenges the decision. Finding petitioner's arguments unpersuasive, we affirm.

## I. Background

The four parcels of land at issue are located in the northeast quadrant of the District of Columbia, adjacent to Sixth Street and bordered by Penn Street on the north and Florida Avenue on the south. On October 15, 2015, Gallaudet University and JBG/6th Street Associates submitted an application for approval of a mixed-use development spanning the 273,514 square foot property. The Office of Planning ("OP") reviewed the proposal and convened a meeting with various agencies, including the Department of Transportation ("DDOT"). On April 21, 2016, the Commission published a notice in the D.C. Register — and mailed notice to owners of all property within 200 feet of the parcels — that it would hold a hearing to review the proposal on June 23, 2016. Advisory Neighborhood Commission 5D presented a letter supporting the project.

Union Market Neighbors ("UMN") submitted a request for party status to oppose the project. On the day of the hearing, the organization supplemented its submission with form letters filled out by eight individuals living in the area and one person who worked there. A representative of UMN notified the Commission that same day that he could not attend the hearing; instead, he renewed the group's request for party status and urged the Commissioners to ask the staff of OP and DDOT a list of questions spanning three pages. Nobody from the group appeared at the meeting, and the Commission denied petitioner's request for party status.[1]

---

[1] Petitioner asks us to reverse because the Commission denied its request for party status. This court recently discussed a similar argument in a case where UMN sought party status to oppose a PUD application but did not appear at the relevant hearing to support its application for party status. *See Union Market Neighbors v. District of Columbia Zoning Comm'n*, 197 A.3d 1063, 1068 n.5 (D.C. 2018) ("*UMN I*"). In this instance, the Commission denied party status because no representative of UMN appeared at the hearing or made himself available for cross-examination. Furthermore, the group's members had not "provided evidence of how they were uniquely affected" by the proposal. Indeed, the Commission noted, UMN's "submissions appear to refer to a different project insomuch as they refer to proposed hotel use, which is not a part of the instant project." As in the previous case, we need not determine whether UMN was entitled to party status: "[B]y its failure to appear at the hearing to support its application, [UMN] necessarily was in no position to exercise the most significant right of party status; viz.: to cross-examine witnesses." *Id.* Importantly, the Commission paid careful attention to the concerns raised by UMN. In fact, the Commission's order devoted nearly five pages to a point-by-point discussion of issues that UMN had identified in writing.

The Commission did not vote on the first-stage PUD application at that hearing but instead asked intervenors to file supplemental documents. The applicants presented revised proposals before the meetings in September and October of 2016, but on both occasions the Commission expressed concerns about the package of benefits and amenities and deferred voting. In March 2017 intervenors submitted another revision, which, among other things, increased the amount of affordable housing. The Commission approved the first-stage PUD on May 8, 2017, and thereafter issued a forty-nine-page order. The order contained more than 100 findings of fact on a wide range of topics including the development's effects on the housing supply, Gallaudet University's connection to the community, greenhouse gas emissions, outdoor spaces, public utilities, and public transportation. UMN timely filed this petition for review.[2]

---

[2] We reject intervenors' argument that UMN lacks standing to bring this petition for review. At least some of the group's members stated that they lived within 200 feet of the development and their representative expressed concerns about air pollution, traffic, noise, parking, destabilization of land values, and the impact of this development on the community values they enjoyed. To be sure, many of these concerns were stated in general and conclusory terms, but there is no doubt that this large development would dramatically change the nature of the neighborhood. As in *UMN I*, the organization has adequately demonstrated that its members were "adversely affected or aggrieved[] by an order or decision of . . . an agency in a contested case," entitling it to seek judicial review. *See UMN I*, 197 A.3d at 1067 n.3 (quoting D.C. Code § 2-510 (a) (2012 Repl.)); *see also D.C. Library Renaissance Project/West End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 114 (D.C. 2013) (discussing zoning cases where standing was recognized).

## II. Standard of Review

This court may reverse an agency's decision "where it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 'without observance of procedure required by law,' or 'unsupported by substantial evidence in the record of the proceedings before the Court.'" *UMN I*, 197 A.3d at 1067–68 (alterations omitted) (quoting D.C. Code § 2-510 (a)(3)(A), (D), (E) (2012 Repl.)). "Furthermore, while determinations of law are the ultimate responsibility of this court, we recognize the Commission's 'statutory role and subject-matter expertise [and] generally defer to the Commission's interpretation of the zoning regulations.'" *Id.* at 1068 (alteration in original) (quoting *Howell v. District of Columbia Zoning Comm'n*, 97 A.3d 579, 581 (D.C. 2014)).

"[W]ith respect to the evidentiary record, 'we must affirm the Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings.'" *Id.* (quoting *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1167 (D.C. 2013)). An agency's decision "is presumed to be correct, so that the burden of demonstrating

error is on the appellant or petitioner who challenges the decision." *Id.* (quoting *Johnson v. District of Columbia Office of Emp. Appeals*, 912 A.2d 1181, 1184 (D.C. 2006)).

## III. Analysis

As this court recently discussed, the "PUD process is a flexible zoning scheme that allows for the development of large areas as a single unit." *Barry Farm Tenants & Allies Ass'n v. District of Columbia Zoning Comm'n*, 182 A.3d 1214, 1219 (D.C. 2018) (citation, alterations, and internal quotation marks omitted). "The overall goal of the process is to permit flexibility in the zoning regulations, so long as the PUD 'offers a commendable number or quality of public benefits' and 'protects and advances the public health, safety, welfare, and convenience.'" *Id.* (quoting 11 DCMR § 2400.2 (2002)).[3] "In deciding a PUD application, the Commission shall judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development

---

[3] New zoning regulations became effective on September 6, 2016; however, we proceed under the older regulations since they were in effect at the time of the hearing. *See Barry Farm Tenants*, 182 A.3d at 1220 n.8 (citing 11-A DCMR § 100 (2016)).

incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8 (2013).

An applicant may seek Commission approval of a PUD in two stages, as here, rather than one. *See id.* § 2402.1 (2000). In a two-stage PUD:

> (a) The first stage involves a general review of the site's suitability for use as a PUD; the appropriateness, character, scale, mixture of uses, and design of the uses proposed; and the compatibility of the proposed development with city-wide, ward, and area plans of the District of Columbia, and the other goals of the PUD process; and

> (b) The second stage is a detailed site plan review to determine compliance with the intent and purposes of the PUD process, the first stage approval, and this title.

*Id.* § 2402.2.

## A. Housing Linkage Requirement

UMN first argues that the Commission made a legal error by ignoring a "housing linkage" mandate in the zoning regulations, which in certain circumstances requires "the applicant to produce or financially assist in the

production" of off-site affordable housing. *See id.* § 2404.2. Intervenors counter that their project does not trigger the provision because it does not propose "an increase in gross floor area devoted to office space over and above the amount of office space permitted as a matter of right under the zoning included as part of the PUD." *See id.* § 2404.1. Additionally, they argue, there is no obligation to address housing linkage until the second stage of the PUD process.

We agree with intervenors that the Commission did not err as a matter of law. Even if this project triggers the housing linkage requirement, a matter we need not decide at this time, petitioner has not demonstrated that a PUD must include such a provision at the first stage. As the regulations specify, the first stage of the PUD process "involves a general review" whereas the second stage includes "a detailed site plan review to determine compliance." *Id.* § 2402.2. The planning for this project is not complete, and intervenors explain that "[t]he precise mix of residential and commercial uses will not be finalized until the Second Stage PUD is submitted." As the Commission notes, the "second-stage design of the PUD shall be based on further development and refinement."

The Commission will have to approve the project again before intervenors can complete essential requirements, such as obtaining building permits. *See*

*Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n*, 979 A.2d 1160, 1166 (D.C. 2009) (citing 11 DCMR §§ 2408.8, 2409.1). If UMN raises the issue of housing linkage during the second stage of the PUD process, intervenors will be in no position to assert that the protest comes too late.

## B. Review and Balancing by the Commission

UMN asserts that the Commission failed to conduct "the legally required comprehensive public review of adverse effects on surrounding communities" or even take that obligation "seriously." We cannot credit this hyperbole after reading the Commission's detailed order and considering the procedural history of this matter. Although UMN obviously disagrees with the decision made, that does not mean that the Commission neglected its duty.

At the time of the application, the property was zoned C-M-1, a designation that does not allow residential uses. The zoning amendment requested would allow "the construction of residential, office, retail, and university-support uses," thus "replacing an underutilized site with a mixed-use development." The proposal would not displace any residents, but instead would substantially expand

the housing supply in the neighborhood, serving the objective of locating housing near Metrorail stations.

At its September 2016 hearing the Commission was not satisfied that the proposed benefits and amenities were commensurate with the level of zoning flexibility requested. There was particular concern about the amount of affordable housing. The Commission and the OP held several months of discussions with intervenors and relevant agencies about these and other matters, which led to enhanced proffers and detailed requirements. For example, the order mandates affordable housing in ten percent of the property's floor area that is residential, most of which is reserved for households earning fifty percent or less of the Area Median Income. This commitment provides "more affordable housing on-site than is required and it is providing it at deeper affordability levels than is required."

It is not necessary to recite all the benefits and amenities that the Commission considered, but in light of UMN's particular concerns, we will also mention the applicants' "commitment to the First Source program," which "is the District's preferred mechanism for ensuring that District residents are given priority in job placement." Additionally, the project would establish a new gateway to the Gallaudet University campus (contributing to the integration of the

university into the surrounding neighborhood), incorporate DeafSpace architectural principles in the streetscape, and construct buildings to be certified as Leadership in Energy and Environmental Design (LEED) Gold. In reviewing the benefits and drawbacks of these features and others, the Commission made findings of fact based on substantial evidence and conclusions of law that rationally follow.

As mentioned above, the Commission devoted five pages of its order to concerns raised by UMN, including consistency with the Comprehensive Plan, the proposed high-density uses, the amount of affordable housing, job creation, and impacts of the PUD on the quality of life, transportation, and parking. It rejected the argument "that the impact of the high-density office use on nearby low-density residential districts has not been analyzed," explaining that this topic was "thoroughly analyzed during the development of the Florida Avenue Small Area Plan as well as in the instant project." That Small Area Plan[4] had also considered "the challenge of rising housing costs" and the destabilization of land values in the community. We cannot agree with petitioner's argument that the Commission

---

[4] Small Area Plans "provide supplemental guidance to the Zoning Commission and other District agencies in carrying out the policies of the Comprehensive Plan." D.C. Code § 1-306.03 (c)(4) (2012 Repl.). The Commission must interpret Small Area Plans "in conjunction with the Comprehensive Plan," *Barry Farm Tenants*, 182 A.3d at 1219 (citing 10-A DCMR § 2503.3 (1994)), which itself is a non-binding "interpretive guide" unless otherwise provided, *Durant*, 65 A.3d at 1168.

failed adequately to consider the impact of this project on UMN and its members. Nor was UMN denied due process, as it asserts, by the Commissioners' election not to ask the questions it submitted in writing.

## IV. Conclusion

"It is decidedly not this court's role to 'reassess the merits of the [agency's] decision.'" *UMN I*, 197 A.3d at 1067 (quoting *Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005)). Given our deferential standard of review, we hold that petitioner has not demonstrated that the Commission failed to do its job. The order under review is hereby

*Affirmed.*